# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### *Southern Division*

MARC R. SLAVIN, *et al.*,                    *

      Plaintiffs/Counter-Defendants,     *

v.                                           *            Civil Case No.:  PWG-16-2511

IMPERIAL PARKING (U.S.), LLC,                *

      Defendant/Counterclaimant.         *

                                                            *

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## MEMORANDUM OPINION AND ORDER

Plaintiffs/Counter-Defendants MarcParc Valet, Inc., and MarcParc, Inc. and their sole shareholder, Marc R. Slavin (collectively, "MarcParc"), filed suit against Defendant Imperial Parking (U.S.), LLC ("Impark"), claiming breach of contract in Count I and seeking to confirm and enforce an arbitration award against Defendant in Count II.  Compl., ECF No. 2.  Impark removed to this Court, ECF No. 1, and filed a Counterclaim ECF No. 33, which it later amended to clarify the relief it sought, without altering its counterclaims, ECF No. 52.  Impark counterclaims for breach of two contracts: an Asset Purchase Agreement (Count I) and a Transition Services Agreement (Count II), fraudulent inducement (Count III), breach of duty of good faith and fair dealing (Count IV), tortious interference with contractual relations and prospective economic advantage (Count V), and civil conspiracy (Count VI).  Am. Countercl. Pending is MarcParc's Motion to Confirm Arbitration Award, seeking entry of judgment in its favor on Count II and to have that judgment made final pursuant to Rule 54(b), Pls.' Confirmation Mot., ECF No. 35, as well as MarcParc's Motion to Dismiss Count I of Defendant's Amended Counterclaim in part and to dismiss Counts III, IV, and VI in their

entirety, Pls.' Dismissal Mot., ECF No. 41.[1]  Because I find that Impark's challenge to the award is untimely, I will grant MarcParc's Motion to Confirm Arbitration Award and enter judgment in MarcParc's favor on Count II, although I will not enter a final judgment pursuant to Rule 54(b). Impark concedes that Count I of its Amended Counterclaim should be dismissed in part if MarcParc's Motion to Confirm Arbitration Award is granted.  Additionally, *res judicata* bars Counts III, IV, and VI of the Amended Counterclaim.  Accordingly, I will grant MarcParc's Motion to Dismiss Count I of Defendant's Amended Counterclaim in part and to dismiss Counts III, IV, and VI in their entirety.  This lawsuit will proceed with regard to the remaining claims – Count I of Plaintiffs' Complaint and Counts II, V, and part of Count I of Impark's Amended Counterclaim.  Discovery is set to close on June 26, 2017, and a status report is due July 10, 2017, after which I will schedule a status conference.

**<u>Background</u>**

MarcParc and Impark entered into an Asset Purchase Agreement ("APA" or "Purchase Agreement") on March 10, 2015, under which MarcParc, a company that operated public parking lots and garages in Washington, D.C., Virginia, and Maryland, "sold substantially all of its assets" to Impark.  Pls.' Confirmation Mem. ¶¶ 1–2; Def.'s Opp'n to Confirmation 3; APA 1, ECF No. 35-2.  The Purchase Agreement set the price at $7,430,000.00, but the parties agreed that the "amount was to be adjusted, depending on various subsequent events." Pls.' Confirmation Mem. ¶ 5; APA §§ 3.1, 6.1(a).  Relevantly, Impark paid $6,430,000.00 at closing (minus deductions not relevant here), with the understanding that the initial payment could be

---

[1] The parties fully briefed the Motion to Confirm Arbitration Award, ECF Nos. 35-1, 39, 44, and the Motion to Dismiss, ECF Nos. 41-1, 45, 47.  I refer to the parties' briefs regarding MarcParc's Motion to Confirm Arbitration Award as "Pls.' Confirmation Mem.," "Def.'s Opp'n to Confirmation," and "Pls.' Confirmation Reply," and I refer to the parties' briefs regarding MarcParc's Motion to Dismiss as "Pls.' Dismissal Mem.," "Def.'s Opp'n to Dismissal," and "Pls.' Dismissal Reply."  A hearing is not necessary.  *See* Loc. R. 105.6

augmented by a "Holdback Amount," with MarcParc receiving up to an additional $1 million if none of MarcParc's leases and/or management agreements for its parking facilities was cancelled within 120 days after March 10, 2015 (the "Holdback Period"); that amount would be reduced by the stipulated economic values of any parking facilities with such cancellations, and MarcParc could end up owing money to Imperial if the total value of the facilities with cancellations exceeded $1 million. Pls.' Confirmation Mem. ¶ 6; Def.'s Opp'n to Confirmation 3–4; APA § 6.8(a).

According to MarcParc, "the parties also orally agreed that MarcParc would receive a credit for any new contracts obtained during the Holdback Period due to MarcParc's efforts," which "could be offset against any deduction from the Holdback Amount owed to Impark but could not result in an affirmative increase in the Purchase Price." Pls.' Confirmation Mem. ¶ 7. MarcParc asserts that "[t]he agreement concerning MarcParc's credit was memorialized in an email exchange a few hours after execution of the APA." *Id.*; Mar. 10, 2015 Email, ECF No. 35-3 (email from MarcParc's attorney Steven Friedman to Impark's attorney Brian Schlect, copied to Marc Slavin and Impark's other attorney Darren Nakata, noting that "neither Section 6.8(a) nor Schedule S w[as] changed to incorporate the concept that if MarcParc pick[ed] up any new business during the 120 holdback period, that new business could offset the holdback amount," a concept that Friedman had raised in a previous email to Impark's attorneys; responsive email from Schlect, stating that Nakata would "confirm with [Friedman] Impark's agreement to the concept"). Impark insists that, to the contrary, the Purchase Agreement had a "zipper clause," APA § 27.1, and provided that "[n]o amendment, modification, supplement, termination or waiver of any provision of this Agreement will be effective unless in writing signed by the appropriate party [and] . . . [e]-mails shall not change, modify, alter or affect the terms and

conditions of this Agreement," thereby precluding any oral or e-mailed amendment. Def.'s

Opp'n to Confirmation 4 n.3 (quoting APA § 27.2).

The Purchase Agreement provided that Impark would deliver its calculation of the

Holdback Amount to MarcParc thirty days after the conclusion of the Holdback Period. Pls.'

Confirmation Mem. ¶ 8; APA § 6.8(b). Then, if the parties disagreed about the Holdback

Amount and were unable to resolve their dispute, they would "submit the disputed matters to

Grossberg Company . . . (the 'Independent Accountants'), to make a final determination of the

calculation." Pls.' Confirmation Mem. ¶¶ 9–10; APA § 6.8(b)(iii). The Purchase Agreement

further provided:

> The Parties shall instruct the Independent Accountants promptly to determine
> solely with respect to the disputed items and amounts so submitted whether and to
> what extent, if any, the calculation requires adjustment. [Impark] and [MarcParc]
> shall make available to the Independent Accountants all relevant books and
> records and other items reasonably requested by the Independent Accountants.
> The Parties shall request that the Independent Accountants deliver to [Impark]
> and [MarcParc], as promptly as practicable but in no event later than 30 days after
> its retention, a report which sets forth its resolution of the disputed items and
> amounts and its calculations. The decision of the Independent Accountants shall
> be final, conclusive and binding on the Parties, except for fraud, manifest error or
> failure to adhere to the [stipulated economic values]. The costs and expenses of
> the Independent Accountants shall be borne pro rata by the Parties in accordance
> with the difference between each Party's proposed calculations and the
> calculation calculated by the Independent Accountants. Each Party agrees to
> execute, if requested by the Independent Accountants, a reasonable engagement
> letter, including customary indemnities in favor of the Independent Accountants.

APA § 6.8(b)(iii). The parties agree that this is an arbitration clause, even though it refers to an

independent accountant rather than an arbitrator. *See* Pls.' Confirmation Mem. ¶ 26; Def.'s

Opp'n to Confirmation 1–2.

In calculating the Holdback Amount, Impark determined that it was not obligated to pay

any of the $1 million to MarcParc, and instead, MarcParc owed it $108,803.80. Holdback

Refund Sched., ECF No. 35-4. MarcParc disputed the amount, believing that it was entitled to

the full $1 million. Holdback Refund Dispute Notice, ECF No. 39-1; Dec. 10, 2015 Ltr. to

Grossberg 7, ECF No. 39-2. MarcParc asserted that the Holdback Refund Schedule did "not

reflect and/or take into account any new revenue generated from and attributable to new parking

facility locations that were added to the inventory of locations since the Asset Purchase

Agreement was signed and closed," insisting that the new revenue was "supposed to be taken

into account as off-sets against any loss of revenue resulting from the termination of any

contracts during the Holdback Period." Holdback Refund Dispute Notice 2. According to

MarcParc, the new revenue exceeded $1 million. Dec. 10, 2015 Ltr. to Grossberg 7.

Unable to resolve the dispute, MarcParc submitted it to Richard Hill of Grossberg

Company ("Grossberg") on December 10, 2015 and notified Impark of the submission. Dec. 10,

2015 Ltr. to Grossberg. Although MarcParc had identified Grossberg as an independent

accountant when Impark asked it to identify one for purposes of dispute resolution, Grossberg

had "provided income tax and consulting services to MarcParc, Inc. for approximately eight

years." Engagement Ltr. 2, ECF No. 35-7. Impark insists that, contrary to MarcParc's assertions

(Pls.' Confirmation Mem. ¶ 11 ("Plaintiffs contend this was disclosed to Impark when Section

6.8(b)(iii) was drafted. . . . Additionally, Slaving contends he personally notified Impark on

numerous occasions through telephone and email communications that Grossberg was his

accountant . . . .")), MarcParc never notified Impark of its relationship with Grossberg.[2] Nakata

Aff. ¶¶ 5–7, ECF No. 39-6. Thus, unaware of the relationship, Impark made its submission to

---

[2] As Impark acknowledges, Def.'s Opp'n to Confirmation 16, over a year earlier, in a December 8, 2014 email to Grieve, MarcParc's COO Paul Harbolick stated that MarcParc "use[d] Grossberg Company a local CPA firm to prepare the [tax] returns." Dec. 8, 2014 Email, ECF No. 39-10. Yet, Impark asserts that Grieve "would not have had any reason to review or be consulted about the dispute resolution provisions . . . of the APA." Def.'s Opp'n to Confirmation 17.

Grossberg by letter on January 27, 2016, ECF No. 35-5, and email on January 28, 2016 at 5:14 p.m., ECF No. 39-3.

Two hours later, at 7:33 p.m. on January 28, 2016, Doug Grieve, Impark's Vice President and Controller, sent an email to Impark's attorney, Nakata, and others at Impark, stating that he "just became aware that the Independent accountant being used[,] Richard Hill, is Marc and Marcparc's regular accountant and has been involved with the account, year end and taxes of Marcparc for numerous years," and wondering if the relationship presented a conflict of interest. ECF No. 39-4. According to Nakata, he first learned about Impark's relationship with Grossberg when he received that email, and he and "certain senior executives at Impark . . . determined that Impark should no longer participate in any arbitration proceeding regarding to 'Holdback Amount' before Mr. Hill because Mr. Hill was not an 'Independent Accountant." Nakata Aff. ¶ 7.

Meanwhile, Grossberg had mailed an engagement letter to the parties on January 27, 2016 and sent the same by email to their attorneys on January 29, 2016, disclosing that it had provided and continued to provide accounting services for MarcParc. Engagement Ltr. 2. Impark did not respond to Grossberg's engagement letter or later inquiries for more information regarding analysis of the Holdback Amount. *See* Jan. 28, 2016 – Feb. 20, 2016 Email Chain, ECF No. 35-8 (emails from Hill to Nakata without response); Feb. 26, 2016 Email, ECF No. 35-10 (email from Hill to the parties, noting "Impark's decision not to respond to our requests for comments and additional information"). Nakata did, however, inform MarcParc's attorney, Friedman, by phone on February 9, 2016 "that Impark objected to Mr. Hill serving as the 'Independent Accountant.'" Nakata Aff. ¶ 8. He also stated that "Impark remained prepared to

proceed with arbitration, provided that the parties selected a truly 'Independent Accountant,'" *Id.* ¶ 9.

In a February 17, 2016 email to Nakata, which was copied to Friedman, Hill stated that he learned from MarcParc's counsel that Impark had "expressed concerns about Grossberg Company handling the arbitration." Jan. 29, 2016 – Feb. 20, 2016 Email Chain 1–2, ECF No. 39-5. Hill wrote:

> We did not ask to be a part of this, but agreed to when asked. Although Marc is a client, we take our responsibility seriously to decide the issues in accordance with the agreement signed by both parties, not based on our business relationship. Our process will be to have an independent partner at the firm (one who is not involved with Marc's work) review the decision and affirm agreement or require changes before we issue the decision. Our participation in the process is solely in accordance with the agreement of both parties at the time of Impark's acquisition of MarcParc's assets. It is a difficult position for us as well, but we will seek to fulfil it faithfully.

*Id.* at 2.

On February 20, 2016, Grossberg provisionally agreed with MarcParc and entered an arbitration award ("Arbitration Award") of $1 million in favor of MarcParc and against Impark. Arbitration Award, ECF No. 35-9. Grossberg invited the parties' "prompt response." Jan. 29, 2016 – Feb. 20, 2016 Email Chain 1. Nakata, instead of responding to Grossberg, emailed MarcParc's counsel that day that he was "surprised" that Grossberg was "moving forward at all." *Id.* On February 26, 2016, after receiving additional information from MarcParc that did not change its decision, and no information from Impark, Grossberg finalized its decision. Feb. 26, 2016 Email.

Thereafter, in a March 2, 2016 phone call, memorialized in a March 9, 2016 letter to Friedman, Nakata "reiterated [his] concerns about Mr. Hill's lack of independence" and stated again that Impark was willing to proceed with arbitration "before a truly 'Independent

Accountant.'" Nakata Aff. ¶¶ 10, 11; *see* Mar. 9, 2016 Ltr., ECF No. 35-11. He stated that the parties agreed "to submit any holdback dispute to an independent accountant," but "[i]t is difficult to understand how anyone could reasonably conclude that Richard Hill could serve as an independent accountant given his long history of providing accounting services to MarcParc and Marc Slavin," and "because of this history, [Impark did] not believe that another accountant at Grossberg Company could be considered independent either." Mar. 9, 2016 Ltr.

MarcParc filed suit to confirm the Arbitration Award on May 18, 2016, and Impark removed to this Court on July 7, 2016. ECF Nos. 1, 2. Prior to opposing MarcParc's pending Motion to Confirm Arbitration Award, Impark did not move to vacate the Arbitration Award or otherwise formally oppose it.

## Choice of Law

MarcParc seeks to confirm the Arbitration Award, while Impark argues that the award should be vacated instead of confirmed. According to MarcParc, "the parties specifically provided in their APA that future disputes between them would be governed by *both* the District of Columbia's substantive *and* procedural rules," and the procedural rules include the D.C. arbitration act.[3] Pls.' Confirmation Reply 4–5. As they see it, this means that the District of Columbia's arbitration law applies, *id.*, and "[u]nder District of Columbia law, the Court must confirm the Arbitration Award since Impark never filed a post-Award motion to modify or vacate the award and the time for doing so is now long past," Pls.' Confirmation Mem. 8. They insist that, even if the Maryland Uniform Arbitration Act applied, the Court still would have to

---

[3] The parties both refer to the District of Columbia Uniform Arbitration Act ("DCUAA"), but the DCUAA was repealed in 2009 and replaced by the Revised Uniform Arbitration Act, D.C. Code §§ 16–4401 to 16–4432. *Bolton v. Bernabei & Katz, PLLC*, 954 A.2d 953, 958 n.1 (D.C. 2008) (citing Arbitration Act of 2007, D.C. Law 17–111, § 3, 55 DCR 1847).

confirm the Arbitration Award because Impark did not file "a timely post-award motion." *Id.* at 14.

In Impark's view, the choice of law provision does not clearly state that the D.C. arbitration act would apply in lieu of the Federal Arbitration Act ("FAA"), and therefore the FAA applies because "arbitration provisions in contracts involving commerce, such as the APA, apply . . . FAA[] procedures unless there is a clear and unequivocal intent to apply the state's arbitration act." Def.'s Opp'n to Confirmation 1.

The APA's choice of law provision explicitly states that "[t]he substantive and procedural laws, without regard to conflicts of law principles, of the District of Columbia will govern all questions concerning the construction, validity and interpretation of this Agreement and the performance of the obligations imposed by this Agreement." APA § 24.1. Viewing arbitration law as procedural and general choice of law provisions as ones that only specify the substantive law to apply, MarcParc insists that the APA's provision is more than a "general contractual choice of law clause" and therefore applies to arbitration law. *See* Pls.' Confirmation Reply 3, 4 ("[A] general contractual choice of law clause is not in itself sufficient evidence that the parties have chosen to be bound by the applicable jurisdiction's procedural law, such as its arbitration act, in addition to its substantive law . . . ."). But, the FAA is substantive as well as procedural. *See Dewan v. Walia,* 544 Fed. App'x 240, 244 (4th Cir. 2013) ("[The FAA] supplies not simply a procedural framework applicable in federal courts; it also calls for the application . . . of federal substantive law regarding arbitration.") (*quoting Preston v. Ferrer,* 552 U.S. 346, 349 (2008)); *Glass v. Kidder Peabody & Co.*, 114 F.3d 446, 451–52 (4th Cir. 1997) (noting that the FAA provides "the substantive and procedural law associated with arbitration cases and the enforceability of arbitration agreements found valid by the district court"); *Hill v. Peoplesoft USA, Inc.*, 412 F.3d 540, 543 (4th Cir. 2005) ("The Supreme Court has directed that we 'apply

ordinary state-law principles that govern the formation of contracts,' *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944 . . . (1995), and the 'federal substantive law of arbitrability.' *Moses H. Cone Mem'l Hosp.* [*v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)].").  Therefore, if a general choice of law clause covered all substantive law, it would cover arbitration law as well, contrary to the clear Fourth Circuit case law holding that general choice of law provisions selecting state substantive law do not apply to arbitration law.  *See Porter Hayden Co. v. Century Indem. Co.,* 136 F.3d 380, 383 (4th Cir. 1998).

Moreover, the relevant question of what a choice of law clause covers is not substantive versus procedural law but rather law in general versus arbitration law in particular. *See id.* (a choice-of-law provision requiring the application of state substantive law "to resolve disputes arising out of the contractual relationship" is not "an unequivocal expression of the parties' intent to invoke [state], rather than federal, *arbitration* law" (emphasis added)); *UBS Fin. Servs., Inc. v. Padussis*, 127 F. Supp. 3d 483, 492–93 (D. Md. 2015) (same), *aff'd*, 842 F.3d 336 (4th Cir. 2016).  Thus, "absent a clear[ ] expression of the parties' intent to invoke state *arbitration* law, [the Fourth Circuit] will presume that the parties intended federal arbitration law to govern." *Porter Hayden Co.,* 136 F.3d at 383 (emphasis added).

Here, the APA does not specify which arbitration law to apply, and as a result, there is not a "clear[] expression of the parties' intent to invoke [D.C.] arbitration law." *See id.* Therefore, the FAA governs.  *See id.*  Yet, given that there was an agreement to arbitrate, as discussed at length below, this is a distinction without a difference because the same three-month statute of limitations applies pursuant to D.C. and federal arbitration law.  *Compare* 9 U.S.C. § 12 ("Notice of a motion to vacate, modify, or correct an award must be served upon the adverse party or his attorney within three months after the award is filed or delivered. . . ."), *with*

D.C. Code Ann. § 16-4423(c) ("A motion [to vacate an arbitration award] shall be filed within 90 days after the movant receives notice of the award . . . or . . . a modified or corrected award . . . , unless the movant alleges that the award was procured by corruption, fraud, or other undue means, in which case the motion shall be made within 90 days after the ground is known or by the exercise of reasonable care would have been known by the movant.").[4]

## Review of Arbitration Award

"Judicial review of an arbitration award in federal court is 'substantially circumscribed.'" *Three S Del., Inc. v. DataQuick Info. Sys., Inc.*, 492 F.3d 520, 527 (4th Cir. 2007) (quoting *Patten v. Signator Ins. Agency, Inc.*, 441 F.3d 230, 234 (4th Cir. 2006)). Indeed, given that "full scrutiny of such awards would frustrate the purpose of having arbitration at all—the quick resolution of disputes and the avoidance of the expense and delay associated with litigation," a court's review of an arbitration award "is among the narrowest known at law." *Id.* (quoting *Apex Plumbing Supply, Inc. v. U.S. Supply Co.*, 142 F.3d 188, 193 (4th Cir. 1998)). The FAA provides:

> If the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title. If no court is specified in the agreement of the parties, then such application may be made to the United States court in and for the district within which such award was made.

9 U.S.C. § 9.

"If there is a valid contract between the parties providing for arbitration, and if the dispute resolved in the arbitration was within the scope of the arbitration clause, then substantive

---

[4] Although the D.C. law provides additional time when a party learns of fraudulent acts after the issuance of the award, here, Impark learned of the allegedly fraudulent naming of a partial accountant rather than an independent accountant on January 28, 2016, well before the final award issued on February 26, 2016.

review is limited to those grounds set out in [9 U.S.C. § 10].” *Choice Hotels Int'l, Inc. v. Shriji 2000*, No. DKC-15-1577, 2015 WL 5010130, at *1 (D. Md. Aug. 21, 2015) (citing *Apex Plumbing*, 142 F.3d at 193). If “any party to the arbitration” files a motion to vacate, a court may vacate the arbitration award

>    (1)    where the award was procured by corruption, fraud, or undue means;
>
>    (2)    where there was evident partiality or corruption in the arbitrators, or either of them;
>
>    (3)    where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
>
>    (4)    where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a). “[T]he party opposing the award bears the burden of proving the existence of grounds for vacating the award.” *Choice Hotels Int'l, Inc. v. Austin Area Hosp., Inc.*, No. TDC-15-0516, 2015 WL 6123523, at *2 (D. Md. Oct. 14, 2015) (citing *Three S Del., Inc.*, 492 F.3d at 527).

## *Timeliness*

Significantly, as noted, a three-month limitations period applies. 9 U.S.C. § 12 (“Notice of a motion to vacate, modify, or correct an award must be served upon the adverse party or his attorney within three months after the award is filed or delivered . . . .”). This limitations period serves “[t]he role of arbitration as a mechanism for speedy dispute resolution,” as well as the “national policy favoring arbitration” that “[t]he FAA embodies.” *Popular Sec., Inc. v. Colón*, 59 F. Supp. 3d 316, 318–19 (D.P.R. 2014) (citing *Hall Street Assocs. v. Mattel,* 552 U.S. 576, 581–82 (2008)).

District of Columbia law is similar. *See* D.C. Code Ann. § 16-4423.[5]  Yet, the D.C.

statute, unlike the FAA, sets a limitations period (of ninety days) for a party to move to vacate on

the basis that "[t]here was no agreement to arbitrate." *See id.* § 16-4423(a)(5), (c).  Impark

contends that, "[u]nlike the DCUAA, the FAA does not require a party to file a motion to vacate

when that party contends an arbitration award should be vacated because there was no agreement

to arbitrate." Def.'s Opp'n to Confirmation 1.  It insists that, under the FAA, its argument in

favor of vacating is timely because there was no agreement to arbitrate. *Id.*

> Certainly, at least in the First Circuit,

> A party that contends that it is not bound by an agreement to arbitrate can
> therefore simply abstain from participation in the proceedings, and raise the
> inexistence of a written contractual agreement to arbitrate as a defense to a
> proceeding seeking confirmation of the arbitration award, without the limitations
> contained in section 12, which are only applicable to those bound by a written
> agreement to arbitrate.

---

[5] Section 16-4423 provides:

> (a) Upon motion to the court by a party to an arbitration proceeding, the court
> shall vacate an award made in the arbitration proceeding if:
>> (1) The award was procured by corruption, fraud, or other undue means;
>> (2) There was:
>>> (A) Evident partiality by an arbitrator appointed as a neutral
>>> arbitrator;
>>> (B) Corruption by an arbitrator; or
>>> (C) Misconduct by an arbitrator prejudicing the rights of a party to
>>> the arbitration proceeding;
>> (3) An arbitrator refused to postpone the hearing upon showing of
>> sufficient cause for postponement, refused to consider evidence material to
>> the controversy, or otherwise conducted the hearing contrary to § 16-4415,
>> so as to prejudice substantially the rights of a party to the arbitration
>> proceeding;
>> (4) An arbitrator exceeded the arbitrator's powers;
>> (5) There was no agreement to arbitrate; or
>> (6) The arbitration was conducted without proper notice of the initiation of
>> an arbitration as required in § 16-4409 so as to prejudice substantially the
>> rights of a party to the arbitration proceeding.
> (b) The court may vacate an award made in the arbitration proceeding on other
> reasonable ground.

*MCI Telecommc'ns Corp. v. Exalon Indus., Inc.*, 138 F.3d 426, 430 (1st Cir. 1998).

But, as MarcParc notes, "there is in fact an underlying arbitration agreement." Pls.' Confirmation Reply 3. Indeed, Impark asserts that "[i]t is important to note that Impark was not claiming that there was no agreement to arbitrate at all," *see* Def.'s Opp'n to Confirmation 14 n.11, and Impark does not now contend that that there was *no* agreement to arbitrate whatsoever; rather, it argues that "there was no agreement to arbitrate *before Grossberg*," *id.* at 2 (emphasis added). Moreover, it signed and then sought to proceed under the arbitration agreement, asking MarcParc to resolve the dispute through a "truly independent accountant." Def.'s Opp'n to Confirmation 2; *see id.* at 7 ("Notably, Impark did not refuse to participate in any arbitration proceeding whatsoever; rather, it offered to participate in an arbitration proceeding before a truly independent accountant."). Throughout its brief, Impark reiterates its willingness to arbitrate and its communications to MarcParc that "it 'remain[ed] ready to discuss engagement of an independent accountant mutually agreeable to both parties.'" *Id.* at 8–9 (quoting Mar 9, 2016 Ltr.)); *see also id.* at 14; 30; 35. And, it now repeatedly asks the Court to "compel the parties to submit their dispute regarding the 'Holdback Amount' to a truly 'Independent Accountant.'" Def.'s Opp'n to Confirmation 1; *see id.* at 2, 3. Thus, Impark concedes that it is "bound by a written agreement to arbitrate," and consequently it cannot claim the "inexistence of a written contractual agreement." *See MCI Telecommc'ns Corp.*, 138 F.3d at 430. Impark cannot have it both ways, seeking arbitration pursuant to the parties' agreement while denying that same agreement. On these facts, Impark cannot argue credibly that there was no arbitration agreement.

Because there was an agreement to arbitrate, the three month limitations period applies. *See* 9 U.S.C. § 12. Grossberg delivered its final decision on February 26, 2016. Feb. 26, 2016

Email.  Therefore, Impark had until May 26, 2016 to move to vacate the award.  *See* 9 U.S.C.

§ 12.  Impark did not challenge the award in court at all until it filed its Opposition to MarcParc's

Motion to Confirm Arbitration Award on November 3, 2016, over five months later.  It is true

that, when a party moves to confirm an arbitration award and the opposing party asserts in its

opposition that the award should be vacated, "[a] separate motion . . . to vacate the arbitrators'

award is not necessary. Such relief may properly be requested in the papers submitted in

opposition to a motion to confirm an arbitrators' award." *Catz Am. Co. v. Pearl Grange Fruit*

*Exch., Inc.*, 292 F. Supp. 549, 551 (S.D.N.Y. 1968) (citing *The Hartbridge*, 57 F.2d 672 (2d Cir.

1932)).  But, that request must be made within the limitations period. *See Florasynth, Inc. v.*

*Pickholz*, 750 F.2d 171, 175 (2d Cir. 1984) ("[A] party may not raise a motion to vacate, modify,

or correct an arbitration award after the three month period has run, even when raised as a

defense to a motion to confirm."); *Chauffeurs, Teamsters, Warehousemen & Helpers, Local*

*Union No. 135 v. Jefferson Trucking Co.*, 628 F.2d 1023, 1025 (7th Cir. 1980) ("[A party's]

failure to move to vacate the arbitration award within the prescribed time period for such a

motion precludes it from seeking affirmative relief in a subsequent action to enforce the

award."); *W. Int'l Sec. v. Devorah*, 181 F. Supp. 3d 85, 86 (D.D.C. 2014) ("[O]nce those three

months [provided for in 9 U.S.C. § 12] have elapsed, a party may not defend against a petition

for confirmation on any of the grounds set forth in sections 10 and 11."); *Popular Sec., Inc. v.*

*Colón*, 59 F. Supp. 3d 316, 318–19 (D.P.R. 2014) ("Once the three month period for filing a

motion to vacate has expired, a subsequent attempt to vacate an arbitration award cannot

generally be made even in opposition to a later motion to confirm the award.") (citing *Cullen v.*

*Paine, Webber, Jackson & Curtis, Inc.,* 863 F.2d 851, 853–854 (11th Cir. 1989)).

*Fraud*

Impark also asserts that it "was fraudulently induced into agreeing to the arbitration clause that identified Grossberg as the 'Independent Accountant.'" Defs.' Opp'n 3; *see id.* at 26. Perhaps so, but fraud is one of the grounds for moving to vacate, to which the period applies. *See* 9 U.S.C. § 10(a)(1). In this regard, *Fairmount Minerals, Ltd. v. Mineral Serv. Plus, LLC*, No. 14-CV-400-BBC, 2015 WL 542282 (W.D. Wis. Feb. 10, 2015), *appeal dismissed* (Dec. 14, 2015), is informative. There, the plaintiff, which raised fraud after the limitations period had run, insisted that it had "not take[n] a 'wait and see' approach to arbitration because it did not know about the alleged fraud until after the arbitrator issued the award." *Id.* at *3. The court observed that the plaintiff learned about the alleged fraud in time to have "had ample opportunity to challenge the validity of the award under § 10 but failed to do so." *Id.* It also noted that the plaintiff had "not argued or identified any legal authority suggesting that § 10 is an improper means of challenging the validity of an arbitration agreement after the entry of an arbitration award." *Id.* The court reasoned that §§ 9 and 10 applied because the arbitration award already had been entered, whereas "§ 4 sets out a procedure for determining the scope and validity of an arbitration agreement prior to an arbitration." *Id.* Citing *Hall Street Associates, L.L.C. v. Mattel, Inc.,* 552 U.S. 576, 578, 586 (2008), the court concluded that the plaintiff was "bound by the requirements of § 10" because "the Supreme Court has held that §§ 9 and 10 provide the exclusive grounds for vacating, modifying or correcting an arbitration award and that these limited grounds for vacatur cannot be supplemented or expanded by contract." *Id.*

Likewise, here, the alleged fraud did not prevent Impark from acting within the limitations period; as noted, Impark learned that Grossberg's partiality was questionable on January 28, 2016, well before the Arbitration Award issued on February 26, 2016 and the period

began to run. Moreover, Impark's insistence that there was an agreement to arbitrate forecloses any argument that the arbitration clause was not valid. Thus, allegations of fraud do not bring Impark's argument outside the scope of the limitations period. *See* 9 U.S.C. § 10(a)(1); *Fairmount Minerals, Ltd.*, 2015 WL 542282, at *3.

*Party to the Arbitration*

Insisting that, after it made its initial submission to Grossberg, it stopped communicating with the arbitrator, Impark alternatively argues that the limitations period is inapplicable because, in its view, it was not a "'party to' an 'arbitration proceeding.'" Def.'s Opp'n to Confirmation 2. Defendant asserts that "[u]pon learning of Mr. Hill's long-standing relationship with MarcParc, Impark immediately *stopped participating* in the so-called arbitration by refusing to respond to numerous requests." *Id.* at 5 (emphasis added); *see also id.* at 28 ("Impark immediately *ceased its participation* in the so-called 'arbitration proceeding' as soon as it discovered the conflict of interest." (emphasis added)). Impark certainly made clear to MarcParc that it no longer would participate in the arbitration, and Grossberg was aware at the very least that Impark had reservations, albeit through MarcParc's communications, as Impark never notified Grossberg that it objected to the firm acting as the "Independent Accountant." Defendant cites cases from other jurisdictions to support its contentions that a party that refuses to participate in an arbitration proceeding is not required to move to vacate within three months, and that, when arbitration does not go according to the agreement, the limitations period does not apply. But, the facts of this case differ significantly from the cases on which Impark relies.

Impark relies on *Jaffe v. Nocera*, 493 A.2d 1003, 1008 (D.C. 1985), in support of its position that it was not a party to the arbitration and that its objection to the arbitration preserved the issue for court review. Def.'s Opp'n to Confirmation 20, 22. There, although the D.C. Court

of Appeals noted the extent of Nocera's participation in the arbitration, it also stated that "once [a party] was served personally with a demand for arbitration that named him individually as the respondent, he became a party to the arbitration." *Id.* at 1008 (citing Restatement (Second) of Judgments § 34(1) & comment a (1982) (noting that a person named as party can become a party to the action through service or participation in the action)). Here, although Impark ceased its participation, initially, it participated by submitting documents to Grossberg. In its brief, it concedes that "Impark at first was willing to participate in the process and made its initial submission to Richard Hill of Grossberg Company . . . , the so-called '**Independent Accounts**,' on January 28, 2016 at 5:14 p.m. PST." Def.'s Opp'n to Confirmation 5 (bold in original). Indeed, to stop participating, Impark necessarily first had to participate in the arbitration. Consequently, *Jaffe* is inapposite.

Moreover, in *Jaffe*, the court stated that Nocera had three options when he received the demand for arbitration: to seek a stay of arbitration from the court, "to raise the objection that there was no agreement to arbitrate at the arbitration hearing, and to thereby preserve the issue for court review," or "to frame the submission to the arbitrators to include the issue of the identity of the parties to the contract." *Id.* at 1008–09. Nocera, like Impark, did not exercise any of these options.[6] The court concluded that, as a result, Nocera "waived any defense to confirmation of the award against him as void on the basis of a lack of an agreement to arbitrate." *Id.* at 1010. The court denied Nocera's challenge to the award on a different ground, however. It found that, while raising an objection before an arbitrator may preserve the issue, that does not render the statute of limitations inapplicable. Thus, the court did not hold, as Impark seems to suggest, that raising an objection with the opposing party eliminates the need to

---

[6] Impark only raised the issue in communications with MarcParc without communicating its objections directly to Grossberg.

challenge the award within the limitations period; rather, it denied the challenge because it was outside the applicable 90-day statute of limitations and therefore untimely. *Id.* at 1013.

Relying on *Citibank (S. Dakota) N.A. v. Dahlquist*, 2007 MT 42, ¶ 12, 152 P.3d 693, 695 (Mont. 2007), Impark also contends that a party is not a party to the arbitration proceeding and not constrained by the statute of limitations when it does not consent to a specific arbitrator. Def.'s Opp'n to Confirmation 21–22. It is true that in *Dahlquist*, the Montana court held that "[u]nder the FAA, where parties have not agreed to arbitrate, or where the arbitration does not follow the format provided for in the arbitration agreement, the arbitration award is invalid *ab initio*." 2007 MT 42, ¶ 12. For example, an "arbitration award [is] invalid *ab initio*" when the arbitrator used "was not the arbitrator specified in the arbitration agreement," and the party challenging the award "did not consent to arbitration under [that arbitrator]." *Id.* ¶ 15. But, here, the arbitration *did* "follow the format provided for in the arbitration agreement"; Grossberg *was* specified in the arbitration agreement, and Impark consented in the arbitration agreement to submit the Holdback Amount dispute to Grossberg. The issue was, rather, that Grossberg had an undisclosed relationship with MarcParc. Although that likely would have been a basis for a timely challenge to the Arbitration Award, it does not invalidate the award that issued pursuant to the terms of the agreement. *See id.*

### Compelling Arbitration

Impark also argues that it should not be bound by the Arbitration Award because "MarcParc failed to file a motion to compel arbitration, even though it knew that Impark refused to participate in any proceeding before Mr. Hill." Def.'s Opp'n to Confirmation 22–23. Certainly, it would have been appropriate for MarcParc to file a motion to compel. But, given that Impark already submitted its documents to Grossberg, MarcParc did not need to compel any

action on Impark's part for Grossberg to conclude its assessment and issue an award. Consequently, even if MarcParc waived its right to compel arbitration, as Impark contends, Def.'s Opp'n to Confirmation 23, it does not need that right, as it already secured the Arbitration Award.  Once an arbitration award has issued, if the time for the other party to challenge it has passed, then, on motion, the court must confirm the arbitration award. *See* 9 U.S.C. § 9. Moreover, it would have been equally appropriate, if not more so, for Impark to file a motion to stay arbitration. *See Jaffe*, 493 A.2d at 1008–09 (noting that party opposed to arbitration could seek stay of arbitration proceeding); *see also Application of Deiulemar Compagnia Di Navigazione S.p.A. v. M/V Allegra*, 198 F.3d 473, 482 (4th Cir. 1999) (noting that "motions to stay arbitration, compel arbitration, or vacate arbitration awards" are "'judicial proceedings under the FAA'" (quoting *Champs v. Siegel Trading Co.*, 55 F.3d 269, 274 (7th Cir. 1995) (emphasis removed)); *Goel Servs., Inc. v. Kevin Dockett, Sr. Trucking, Inc.*, No. 12-1377-AW, 2012 WL 5252057, at *1 (D. Md. Oct. 22, 2012) (in response to plaintiff's arbitration demand, defendant filed motion to stay arbitration, arguing that it did not accept the agreement to arbitrate, there was a novation negating the agreement to arbitrate, it signed under duress, the dispute was not subject to arbitration, and in any event, plaintiff waived the right to arbitrate).

## Equitable Tolling

"Equitable tolling is available in "those 'rare instances where—due to circumstances external to the party's own conduct—it would be unconscionable to enforce the limitation against the party and gross injustice would result.'" *United States v. Kidd*, No. ELH-12-0606, 2017 WL 1153868, at *3 (D. Md. Mar. 27, 2017) (quoting *Whiteside v. United States*, 775 F.3d 180, 184 (4th Cir. 2014) (quoting *Rouse v. Lee*, 339 F.3d 238, 246 (4th Cir. 2003) (en banc))).

Equitable tolling only applies under "extraordinary circumstances." *Id.* (quoting *Holland v. Florida*, 560 U.S. 631, 634 (2010)).

> For relief under a theory of equitable tolling, an otherwise time-barred petitioner must demonstrate "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Holland*, 560 U.S. at 649 (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)). But, only "'reasonable diligence'" is required. *Holland*, 560 U.S. at 653 (citation omitted). There is no requirement for "maximum feasible diligence." (Citations and internal quotations omitted).

*Id.*

Impark contends that the limitations period "was tolled because, as of March 2, 2016, Impark reasonably believed that MarcParc was not going to enforce the so-called 'award' and it was potentially amenable to submitting the 'Holdback Amount' dispute to a truly independent accountant until June 10, 2016 or, in the alternative, May 10, 2016." Def.'s Opp'n to Confirmation 29–30. Impark insists that, while it "informally learned of MarcParc's intention to enforce the award only eighteen (18) days before the statute of limitation was scheduled to expire, . . . *it did not receive confirmation* of MarcParc's intention to enforce the award *until fifteen (15)* (arguably thirteen (13)) *days after the 90 day (or three month) limitation period expired.*" *Id.* at 31–32.

Impark does not cite any authority for its position that it did not have to act while it was under the impression that MarcParc would not enforce the award, despite the existence of a final award. On the contrary, as discussed, the statute of limitations runs from when the final decision issues. *See* 9 U.S.C. § 12. While Impark may have been relying on MarcParc's assurances, Impark does not suggest that MarcParc's actions, or any other "circumstances external to the party's own conduct" prevented Impark from filing a timely motion. *See Lee*, 339 F.3d at 246; *Whiteside*, 775 F.3d at 184; *Kidd*, 2017 WL 1153868, at *3. These circumstances, in which one party hopes that a conflict will resolve itself without the need for judicial intervention, are far

from extraordinary, and enforcing the limitations period is not unconscionable. *See Lee*, 339 F.3d at 246; *Whiteside*, 775 F.3d at 184; *Kidd*, 2017 WL 1153868, at *3. Thus, equitable tolling is not appropriate under these circumstances. *See Holland*, 560 U.S. at 649; *Kidd*, 2017 WL 1153868, at *3. Consequently, Impark's request to vacate the award is untimely, and this Court must grant MarcParc's Motion to Confirm Arbitration Award and enter judgment in its favor on Count II. *See* 9 U.S.C. § 9.

*Entry of Final Judgment*

Plaintiffs ask the Court to "enter a final judgment pursuant to Fed. R. Civ. P. 54(b) on its order confirming the Arbitration Award." Pls.' Confirmation Mem. 15. The Court may "enter final judgment as to one or more but fewer than all claims in a multiclaim action," pursuant to Rule 54(b), which "allows the district court to provide relief to litigants that would suffer undue hardship if final judgment is not entered on the adjudicated claim prior to the resolution of the unadjudicated claims." *Braswell Shipyards, Inc. v. Beazer E., Inc.*, 2 F.3d 1331, 1335 (4th Cir. 1993). This "certification is recognized as the exception rather than the norm" and "should neither be granted routinely" or "as an accommodation to counsel." *Id.* Rather, it is to "be reserved for the unusual case in which the costs and risks of multiplying the number of proceedings and overcrowding the appellate docket are outbalanced by pressing needs of the litigants for an early and separate judgment as to some claims or parties." *Id.* (quoting *Morrison–Knudsen Co. v. Archer*, 655 F.2d 962, 965 (9th Cir. 1981)). Plaintiffs must show "that the case warrants certification." *Id.*

The Court follows a two-step process to certify a judgment as final pursuant to Rule 54(b). *See id.* (citing *Curtis–Wright Corp. v. General Electric Co.,* 446 U.S. 1, 7–8 (1980)). "First, the district court must determine whether the judgment is final. The Court in *Curtis–*

*Wright* stated that a judgment 'must be final in the sense that it is an ultimate disposition of an individual claim entered in the course of a multiple claims action.'" *Id.* (quoting *Curtis–Wright*, 446 U.S. at 7 (internal quotation marks omitted)). Here, the judgment entered as to Count II is an ultimate disposition of Plaintiffs' claim to confirm the arbitration amount.

> Second, the district court must determine whether there is no just reason for the delay in the entry of judgment. *Curtis–Wright,* 446 U.S. at 8, 100 S.Ct. at 1465. This inquiry, "tilted from the start against fragmentation of appeals, is necessarily case-specific." *Spiegel v. Trustees of Tufts College,* 843 F.2d 38, 43 (1st Cir.1988); *see also Curtis–Wright,* 446 U.S. at 10–11, 100 S.Ct. at 1466–67 ("because the number of possible [Rule 54(b) ] situations is large, we are reluctant either to fix or sanction narrow guidelines for district courts to follow"). In determining whether there is no just reason for delay in the entry of judgment, factors the district court should consider, if applicable, include:

>> (1) the relationship between the adjudicated and unadjudicated claims; (2) the possibility that the need for review might or might not be mooted by future developments in the district court; (3) the possibility that the reviewing court might be obliged to consider the same issue a second time; (4) the presence or absence of a claim or counterclaim which could result in a set-off against the judgment sought to be made final; (5) miscellaneous factors such as delay, economic and solvency considerations, shortening the time of trial, frivolity of competing claims, expense, and the like.

> *Allis–Chalmers Corp. v. Philadelphia Electric Co.,* 521 F.2d [360,] 364 [(3d Cir. 1975)](footnotes omitted); *see also Curtis–Wright,* 446 U.S. at 8, 100 S.Ct. at 1465 ("whether the claims under review were separable from the others remaining to be adjudicated and whether the nature of the claims already determined was such that no appellate court would have to decide the same issues more than once even if there were subsequent appeals") (footnote omitted).

*Braswell*, 2 F.3d at 1335–36.

As discussed further below, Impark has various claims related to the same commercial transaction that could result in a set-off against the judgment in Plaintiffs' favor on Count II. Specifically, Impark seeks damages for its overpayment of "assets it purchased in connection with the APA," the liabilities it incurred, its loss of "the 501 K Street customer contract," and the expenses it has incurred and will continue to incur as a result of "being named a defendant in the

501 K Street Lawsuit," Am. Countercl. ¶ 56; as well as payment of the "sums owed to Impark that Impark had earned after the APA closed," *id.* ¶¶ 59–62. It also seeks damages for "additional existing contracts and/or potential future contracts with other real estate properties owned or controlled by the managing member of 501 K Street property," because it "may lose" those contracts. *Id.* ¶ 77. Because these claims all relate to the same commercial transaction and could set off substantially, if not entirely, the amount Impark owes to MarcParc under Count II, there is a "just reason for delay in the entry of judgment." *See Braswell*, 2 F.3d at 1335–36; *see also Curtis–Wright,* 446 U.S. at 8; *Allis–Chalmers Corp.,* 521 F.2d at 364. Therefore, I decline to enter a final judgment as to Count II at this time. *See Braswell*, 2 F.3d at 1335–36.

### Motion to Dismiss Count I of the Amended Counterclaim in Part

In Count I of its Amended Counterclaim, Impark alleges that MarcParc "breached the APA by violating and/or making false representations and warranties in Section 8," Am. Countercl. ¶ 55, and it asks the Court, *inter alia*, to vacate the Arbitration Award, order the parties to participate in an arbitration proceeding before an independent accountant, and order "MarcParc to pay Impark the appropriate amounts based on the 'holdback' formulas in Schedule S for the 'Redeveloped Properties' and 'Cancelled Properties,'" *id.* at 14. MarcParc argues that, insofar as Count I is a request to vacate the Arbitration Award, it fails to state a claim for breach of contract because it is untimely. Pls.' Dismissal Mem. 10, 13. And, it contends that insofar as Count I is a request "for a money judgment for the APA Schedule S value of the Cancelled Properties and the Redeveloped Properties," it fails to state a claim for breach of contract because it "violates the APA's plain terms." *Id.* at 10, 16. Impark asserts that it included these "requests for relief . . . to preserve Impark's ability to challenge the validity of the arbitration award," and that, "if the Court confirms the arbitration award, Impark's request to vacate the

24

arbitration award should be dismissed." Def.'s Opp'n to Dismissal 8 n.4. Accordingly, I will dismiss Count I in part with regard to Impark's requests for the Court to vacate the Arbitration Award, to order the parties to participate in other arbitration, and to adjust the Holdback Amount that was decided in the Arbitration Award.

## **Motion to Dismiss Counts III, IV, and VI of the Amended Counterclaim**

MarcParc asks the Court to dismiss Counts III, IV and VI of the Amended Counterclaim in their entirety pursuant to Fed. R. Civ. P. 12(b)(6) because, in MarcParc's view, the claims are barred by *res judicata* and the APA's integration clause. Pls.' Dismissal Mem. 19; *see* Pls.' Mot. to Dismiss 1.

### *Standard of Review*

Under Rule 12(b)(6), Impark's counterclaims are subject to dismissal if they "fail[ ] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and must state "a plausible claim for relief," *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "A claim has facial plausibility when the [claimant] pleads factual content that allows the court to draw the reasonable inference that the [opposing party] is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Rule 12(b)(6)'s purpose "is to test the sufficiency of a [claim] and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Velencia v. Drezhlo*, No. RDB-12-237, 2012 WL 6562764, at *4 (D. Md. Dec. 13, 2012) (quoting *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006)). If an affirmative defense "clearly appears on the face of the [pleading]," however, the Court may rule on that defense when considering a motion to dismiss. *Kalos v. Centennial Sur. Assocs.*, No. CCB-12-1532, 2012 WL 6210117, at *2 (D. Md. Dec. 12, 2012) (quoting *Andrews*

*v. Daw*, 201 F.3d 521, 524 n. 1 (4th Cir. 2000) (citation and quotation marks omitted)). One such affirmative defense is *res judicata*.

Although at this stage of the proceedings, I accept the facts as alleged in Impark's Amended Counterclaim as true, *see Aziz v. Alcolac*, 658 F.3d 388, 390 (4th Cir. 2011), when reviewing a motion to dismiss, I "may consider documents attached to the [pleading], as well as documents attached to the motion to dismiss, if they are integral to the [pleading] and their authenticity is not disputed." *Sposato v. First Mariner Bank*, No. CCB-12-1569, 2013 WL 1308582, at *2 (D. Md. Mar. 28, 2013); *see CACI Int'l v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 150, 154 (4th Cir. 2009); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."). Consideration of documents that the [claimant] references and relies upon does not convert a motion to dismiss into a motion for summary judgment. *See Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007).

### *Res Judicata*

When a federal court litigant asserts that a state court judgment has preclusive effect, "[the] federal court must give to [the] state court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984). The Arbitration Award issued in the District of Columbia.

> Under District of Columbia law, "[f]or *res judicata* to apply, the following elements must be satisfied: (1) an identity of parties in both suits; (2) a judgment rendered by a court of competent jurisdiction; (3) a final judgment on the merits; and (4) an identity of the cause of action in both suits."

*Camp v. Kollen*, 567 F. Supp. 2d 170, 172–73 (D.D.C. 2008) (footnote omitted) (quoting *American Forest Council v. Shea*, 172 F. Supp. 2d 24, 29 (D.D.C. 2001) (internal quotations and

citations omitted); *citing Watergate West, Inc. v. Barclays Bank, S.A.*, 759 A.2d 169, 179 (D.C. 2000)).

It is undisputed that the parties are the same. And, under District of Columbia law, "[t]he decisions of binding arbitration proceedings are final decisions on the merits for purposes of res judicata." *Century Int'l Arms, Ltd. v. Fed. State Unitary Enter. State Corp. "Rosvoorouzheinie,"* 172 F. Supp. 2d 79, 95 (D.D.C. 2001) (citing *Schattner v. Girard, Inc.*, 668 F.2d 1366, 1368 (D.C. Cir. 1981)). As Impark sees it, the second element "is immaterial for the purposes of the pending Motion, except for the fact that Impark is challenging the enforceability of the arbitration 'award' issued by Mr. Hill" in its Opposition to MarcParc's Motion to Confirm Arbitration. Def.'s Opp'n to Dismissal 5 n.2; *see also id.* at 2, 7, 9. Impark insists that its challenge prevents the Arbitration Award from having a preclusive effect, and it contends that "because it was not a 'party' to the so-called 'arbitration proceeding,' there is no decision on the merits." *Id.* at 7; *see also id.* at 9 ("[T]he arbitration award is not a final decision on the merits because Impark is challenging the validity of the arbitration award."). But, I already have concluded that Impark was a party to the arbitration and that its challenge to the proceeding was untimely. Consequently, these arguments are without merit, and the Arbitration Award is a final judgment on the merits issued by a court of competent jurisdiction. *See Century Int'l Arms, Ltd.*, 172 F. Supp. 2d at 95; *Camp*, 567 F. Supp. 2d at 173 (giving unconfirmed award preclusive effect where it was not challenged).

With regard to the fourth element of *res judicata*, under District of Columbia law, "[i]f there is a common nucleus of facts, then the actions arise out of the same cause of action." *EDCare Mgmt., Inc. v. DeLisi*, 50 A.3d 448, 451 (D.C. 2012) (quoting *Patton v. Klein*, 746 A.2d 866, 870 (D.C. 1999) (internal quotation marks omitted)). Thus, "[r]es judicata bars not only

claims that actually were litigated in the first action but 'all issues arising out of the same cause of action' that could have been litigated." *Id.* (quoting *Faulkner v. Gov't Emps. Ins. Co.,* 618 A.2d 181, 183 (D.C. 1992)). Therefore, the issue is whether the claims Impark now raises could have been litigated previously.

The APA provided that, if the parties could not agree on the Holdback Amount, then they would "submit *the disputed matters* to Grossberg Company . . . (the 'Independent Accountants'), *to make a final determination of the calculation* pursuant to Section 6.8(a) [Holdback Amount]," and they would "instruct the Independent Accountants promptly *to determine solely with respect to the disputed items and amounts so submitted* whether and to what extent, if any, the calculation requires adjustment." APA 19–20, § 6.8(b)(iii) (emphasis added). Relying on this provision, Impark contends that it limits the scope of arbitration to resolution of the Holdback Amount and "makes it clear . . . that Impark's fraudulent inducement (Count III), good faith and fair dealing (Count IV), and civil conspiracy (Count VI) claims are not within the scope of the arbitration agreement and, as such, they could not have been presented to Mr. Hill (or a truly neutral arbitrator if one was selected)." Def.'s Opp'n to Dismissal 9. Impark insists that "MarcParc's argument that Impark's good faith and fair dealing (Count IV) and civil conspiracy (Count VI) claims are 'back-door attempts to avoid the arbitration award' and thus are barred by the doctrine of *res judicata* misses the mark." *Id.* at 10. MarcParc counters that this argument "ignores the fact that, under either the [D.C.] Act or the FAA, Impark's fraudulent inducement defense to the arbitration clause could have been asserted before a judge." Pls.' Dismissal Reply 7. In MarcParc's view, "[e]ach of the claims in Counts III, IV, and VI stems from Plaintiffs' supposed misrepresentation of Grossberg's independence," and "*res judicata* prevents a party

from affirmatively asserting a claim that could have been raised as a defense in prior litigation if the purpose of the later assertion is to negate the result in the prior case." *Id.* at 5–7.

It is true that Impark could not have brought its claims of fraudulent inducement, good faith and fair dealing, and civil conspiracy before Grossberg. *See* APA 19–20, § 6.8(b)(iii). But, as MarcParc notes, as part of the arbitration, Impark could have brought its claims in court via a motion to stay arbitration or a motion to vacate the award. *See* 9 U.S.C. § 10(a)(1); *Application of Deiulemar Compagnia Di Navigazione S.p.A. v. M/V Allegra*, 198 F.3d 473, 482 (4th Cir. 1999) (noting that "motions to stay arbitration, compel arbitration, or vacate arbitration awards" are "'judicial proceedings under the FAA'" (quoting *Champs v. Siegel Trading Co.*, 55 F.3d 269, 274 (7th Cir. 1995) (emphasis removed)); *Jaffe v. Nocera*, 493 A.2d 1003, 1008–09 (D.C. 1985) (noting option of motion to stay); *Goel Servs., Inc. v. Kevin Dockett, Sr. Trucking, Inc.*, No. 12-1377-AW, 2012 WL 5252057, at *1 (D. Md. Oct. 22, 2012) (motion to stay arbitration filed, challenging acceptance of agreement to arbitrate and scope of arbitration, and raising duress and waiver of right to arbitrate). *See generally Capitol Hill Grp. v. Pillsbury, Winthrop, Shaw, Pittman, LLC*, 569 F.3d 485, 492 (D.C. Cir. 2009) (noting that *res judicata* may bar a permissive counterclaim "if allowing [the] permissive counterclaim to go forward would nullify the earlier judgment or impair rights established in the earlier action"). Therefore, these claims could have been litigated previously as part of the arbitration proceeding, *See Application of Deiulemar Compagnia*, 198 F.3d at 482; *Jaffe*, 493 A.2d at 1008–09, and *res judicata* bars Impark from raising them now. *See Camp*, 567 F. Supp. 2d at 172–73.

## Remaining Claims

This Memorandum and Opinion and Order disposes of Count II of Plaintiffs' Complaint, but not Count I. In Count I, Plaintiffs seek payments due under the Asset Purchase Agreement.

*See* Compl. ¶¶ 12–22.  Insofar as Plaintiffs seek payment of the Holdback Amount, *id.* ¶ 16, that claim is mooted by the confirmation of the Arbitration Award in their favor for the Holdback Amount.  With regard to their claims for payments of the escrow and accounts receivable amounts due under the Purchase Agreement, *id.* ¶¶ 15, 17, as well as attorneys' fees, costs, expenses, and expert witness fees, *id.* ¶ 21, Impark has filed an Answer, ECF No. 10, and those claims will proceed.

This Memorandum and Opinion and Order also disposes of part of Count I and all of Counts III, IV, and VI of Defendant's Amended Counterclaim.  As for Count I of Impark's Amended Counterclaim, as noted, I dismissed the claims for the Court to vacate the Arbitration Award, to order the parties to participate in other arbitration, and to adjust the Holdback Amount that was decided in the Arbitration Award.  In Count I, Impark also claims harm from "having overpaid for assets it purchased in connection with the APA, . . . incurring liabilities that Slavin and MarcParc were obligated to assume, . . . losing the 501 K Street customer contract," and "being named a defendant in the 501 K Street Lawsuit and incurring and continuing to incur substantial litigation expenses in connection with that lawsuit," for which Plaintiffs "refus[e] to defend and indemnify Impark." Am. Countercl. ¶ 56.  And, in Count II, Impark alleges breach of another contract, the Transition Services Agreement that MarcParc and Impark entered into, by MarcParc and Slavin's "refus[al] to remit sums owed to Impark that Impark had earned after the APA closed" and their "refus[al] to defend and indemnify Impark in connection with the 501 K Street Lawsuit." *Id.* ¶¶ 59–62.  Finally, in Count V, Impark claims tortious interference with contractual relations and prospective economic advantage based on 501 K Street's cancellation of "the contract it had in effect with Impark (which 501 K Street had originally entered into with Slavin and MarcParc" due to the fraud that Slavin and MarcParc allegedly "perpetrated at the

501 K Street property." *Id.* ¶¶ 75–76.  Impark claims that it "may lose additional existing contracts and/or potential future contracts with other real estate properties owned or controlled by the managing member of 501 K Street property." *Id.* ¶ 77.  MarcParc has filed an Answer, ECF No. 54, and these claims will proceed.

### ORDER

Accordingly, it is, this <u>19th</u> day of <u>June</u>, <u>2017</u>, by the United States District Court for the District of Maryland, hereby ORDERED that

1.  Plaintiffs' Motion to Confirm Arbitration Award, ECF No. 35, IS GRANTED IN PART AND DENIED IN PART as follows: Judgment IS ENTERED in Plaintiffs' favor on Count II, but the judgment is not made final pursuant to Rule 54(b);

2.  Plaintiffs' Motion to Dismiss Count I of Defendant's Amended Counterclaim in part and to dismiss Counts III, IV, and VI in their entirety, ECF No. 41, IS GRANTED; and

3.  I will schedule a status conference following receipt of the parties' joint status report, which is due on July 10, 2017, following the close of discovery.


_____/S/_____
Paul W. Grimm
United States District Judge

lyb