MARC R. SLAVIN, *et al.*,                    *

      Plaintiffs/Counter-Defendants,          *

v.                                          *          Civil Case No.: PWG-16-2511

IMPERIAL PARKING (U.S.), LLC,               *

      Defendant/Counterclaimant.              *

                                *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM OPINION

Plaintiffs/Counter-Defendants MarcParc Valet, Inc., and MarcParc, Inc. and their sole shareholder, Marc R. Slavin (collectively, "MarcParc") and Defendant/Counterclaimant Imperial Parking (U.S.), LLC ("Impark") entered into an Asset Purchase Agreement ("APA" or "Purchase Agreement") on March 10, 2015 (retroactively effective March 1, 2015), under which MarcParc, a company that operated public parking lots and garages in Washington, D.C., Virginia, and Maryland, "sold substantially all of its assets" to Impark. Pls.' Mem. in Supp. Mot. to Confirm Arb. ¶¶ 1–2, ECF No. 35-1; Def.'s Opp'n to Mot. to Confirm Arb. 3, ECF No. 39; APA 1, ECF No. 80-4. The assets primarily included MarcParc's management contracts and leases pertaining to the parking lots it operated ("Material Contracts"). APA § 8.1(e)(1) & Sched. E, ECF No. 80-4, at 88–92. At the same time, Slavin and MarcParc entered into a Consulting Agreement ("CA" or "Consulting Agreement"), under which Slavin would "provide advice and assistance with regard to (a) the transition of the MarcParc . . . business and assets to Impark, (b) retention by Impark of MarcParc's . . . customers and (c) execution of Impark's business development initiatives and development of new customer opportunities for Impark," in exchange for Impark

paying him $12,500 per month for five years, for a total of $750,000. CA §§ 1.1, 2.1, 5.1, APA Sched. K, ECF No. 80-4, at 120, 121, 123. Additionally, MarcParc Valet, Inc., and MarcParc, Inc. entered into a Transition Services Agreement ("TSA") with Impark, agreeing to assist each other for a period of time after closing the APA with the acquisition and management of the assets Plaintiffs sold to Impark in the APA. APA Sched. T, ECF No. 80-4, at 155–65.

Whatever harmony may have existed between the parties before the execution of these agreements soon vanished once they were signed, and they have been at sword's point ever since. Initially, MarcParc sought to resolve the parties' differences regarding payment of a "Holdback Amount"[1] due under the APA through arbitration, and it obtained an arbitration award ("Arbitration Award") of $1 million in its favor. That only led to further disagreements, and MarcParc filed this suit. Compl., ECF No. 2.

MarcParc claimed Impark breached the APA by failing to pay (a) the $1 million Holdback Amount, (b) $371,500 held in escrow ("Escrow Amount"), and (c) $514,874 from post-closing accounts receivable reconciliation (Count I). It also sought confirmation and enforcement of the Arbitration Award (Count II) and claimed breach of the Consulting Agreement between Slavin and Impark, which Impark had not paid in full (Count III). *Id.* Impark promptly filed a counterclaim for, *inter alia*, breach of the APA through fraud and misrepresentations (Count I);

---

[1] The Purchase Agreement set the price at $7,430,000.00. Impark paid $6,430,000.00 (minus a $371,500 escrow amount that now is in dispute and other deductions not relevant here) at closing, with the understanding that MarcParc could receive up to an additional $1 million (the Holdback Amount) if none of MarcParc's leases and/or management agreements for its parking facilities was cancelled within 120 days after March 1, 2015 (the "Holdback Period"), that is, by July 8, 2015. The parties agreed that the $1 million would be reduced by the stipulated economic values of any parking facilities with such cancellations, and MarcParc could end up owing money to Impark if the total value of the facilities with cancellations exceeded $1 million. Pls.' Confirmation Mem. ¶ 6; Def.'s Opp'n to Confirmation 3–4; APA § 6.8(a).

tortious interference with contractual relations and prospective economic advantage, based on the same allegedly fraudulent actions (Count V); and breach of the TSA by "refusing to remit sums owed to Impark" and failing to defend and indemnify Impark in a lawsuit brought against Impark and MarcParc by the owners of one of the parking lots namely, a lot at 501 K Street in Washington, D.C. ("501 K Street" and "501 K Street Litigation") (Count II).[2] Countercl., ECF No. 33; Am. Countercl., ECF No. 52.

MarcParc filed a Motion to Confirm Arbitration Award, which I granted, June 19, 2017 Mem. Op. & Order, ECF No. 63. I also dismissed three of Impark's counterclaims.[3] *Id.* The June 19, 2017 Memorandum Opinion and Order mooted MarcParc's Count I insofar as it sought to recover the $1 million Holdback Amount, and it dismissed Impark's Count I insofar as it sought to vacate the Arbitration Award, to compel arbitration, and to recover a Holdback Amount from MarcParc. I denied Impark's Motion for Reconsideration of that Memorandum Opinion and Order. Jan. 9, 2018 Mem. Op. & Order, ECF No. 75.

---

[2] These allegations also support Impark's counterclaim for breach of the APA in Count I. Am. Countercl. ¶ 57; *see also id.* ¶ 62.

[3] I dismissed the counterclaims for fraudulent inducement (Count III), breach of the duty of good faith and fair dealing (Count IV), and civil conspiracy (Count VI), concluding that they were barred by *res judicata*. Impark also alleged breach of the duty of good faith and fair dealing as part of its breach of contract claim, but did so for the first time in its Opposition and Memorandum. Def.'s Opp'n & Mem. 26–27. An opposition to a dispositive motion is not a vehicle for amending a pleading. *See Whitten v. Apria Healthcare Grp., Inc.*, No. PWG-14-3193, 2015 WL 2227928, at *7 (D. Md. May 11, 2015). Moreover, the September 30, 2016 deadline for amending the pleadings has long passed, *see* ECF Nos. 19, 58, and Impark has not shown good cause for amending at this late juncture. *See* Fed. R. Civ. P. 16(b); *CBX Techs., Inc. v. GCC Techs., LLC*, No. JKB-10-2112, 2012 WL 3038639, at *3 (D. Md. July 24, 2012). Therefore, to the extent Impark attempts to raise a claim for breach of contract based on a duty of good faith and fair dealing in its substantive briefing, it is dismissed. *See Whitten*, 2015 WL 2227928, at *7; *see also* Fed. R. Civ. P. 16(b); *CBX Techs.*, 2012 WL 3038639, at *3.

The parties then stipulated to the dismissal of MarcParc's claim in Count I of the Complaint for $514,874 from post-closing accounts receivable reconciliation. ECF No. 82. They also stipulated to the dismissal of Impark's claims in Counts I, II and V of the Amended Counterclaim for future defense expenses arising from and indemnification for the 501 K Street Litigation. ECF No. 81.

But what remains at issue is still significant, and it is the subject of the parties' pending cross-motions for partial summary judgment. ECF Nos. 80, 85.[4] Because genuine disputes of material fact exist regarding MarcParc's alleged misrepresentations and fraudulent actions and their effect on the contracts between the parties, the parties' cross-motions for partial summary judgment are, for the most part, denied as to MarcParc's Complaint and Counts I and III of Impark's Amended Counterclaim. MarcParc's motion is granted only as to Impark's counterclaim for tortious interference (Count V) and any counterclaim Impark sought to bring in its substantive briefing for breach of the duty of good faith and fair dealing. Impark's motion is granted, as to liability only, on (1) its APA counterclaim in Count I against Plaintiffs for costs and fees from the 501 K Street Litigation (the amount of those costs and fees await further determination), (2) its TSA counterclaim in Count II against the MarcParc Companies for the same; and (3) its claim in Count I of the Amended Counterclaim for pre- and post-closing liabilities. The motions otherwise are denied.

---

[4] The parties fully briefed the motions. ECF Nos. 80-1 (Pls.'s Mem.), 84 (Defs.' Opp'n & Mem.), 87 (Pls.' Reply & Opp'n), 88 (Defs.' Reply). A hearing is not necessary. *See* Loc. R. 105.6. The parties agree that District of Columbia law applies to the APA and Maryland law applies to the CA. Pls.' Mem. 23, 37–38; Def.'s Opp'n & Mem. 13. And, both parties consider the claims based on breach of the TSA under D.C. law. Def.'s Opp'n & Mem. 35; Pls.' Reply & Opp'n 15.

**Standard of Review**

Summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A); *see Baldwin v. City of Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013). If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows that a genuine dispute exists as to material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 & n.10 (1986). When considering cross-motions for summary judgment, "the court must view each motion in a light most favorable to the non-movant." *Linzer v. Sebelius*, No. AW-07-597, 2009 WL 2778269, at *4 (D. Md. Aug. 28, 2009); *see Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003).

**Breach of APA and CA**

The crux of the parties' dispute is how MarcParc's conduct (and Slavin's in particular) before the Holdback Period ended affected the terms of the parties' agreements and Impark's and Slavin's obligations under the agreements. MarcParc claims that Impark breached the APA and the CA by failing to pay the remaining amounts due under the contracts ($371,500 under the APA and $650,000 under the CA) and seeks summary judgment for those amounts. Impark counters that MarcParc and Slavin materially breached representations and warranties they made in both contracts before Impark ceased performing under the contracts, thereby releasing Impark from its contractual obligations and entitling it to damages. Def.'s Reply 1.

The relevant representations and warranties MarcParc made in the APA were that

- the "Books and Records fairly and correctly set out and disclose[d] in all material respects the financial position and condition of the Seller and all material financial transactions of the Seller relating to the Business have been accurately recorded in such Books and Records in the Ordinary Course of Business";

- there had "not been any default in any term, condition, provision or obligation to be performed under any Material Contract, and to Seller's Knowledge, each such Material Contract is in good standing";

- "neither the Seller nor Slavin [wa]s aware of any existing ground on which any action, suit or proceeding [could] be commenced with any reasonable likelihood of success";

- it was not violating any law; and

- there were no disclosures that the Seller or Slavin should make to ensure that "the representations and warranties [were] not misleading" or because they could "materially and adversely affect the Business or would operate to prevent the Purchaser from using the Assets to operate the Business in the manner in which the Seller has operated the Business prior to the date of this Agreement."

APA § 8.1(f), (n), (p), (aa), (cc). In the Consulting Agreement, Slavin agreed to

- provide "reasonable consulting and sales representative services," including "work[ing] with employees of Impark and its affiliates in a competent and professional manner to promote the interests of Impark and its affiliates and their customers";

- "exercise the degree of skill and care as would be expected of someone providing such services, but in any case . . . exercise no less than a reasonable degree of care";

- "[d]iligently promote the goodwill and reputation of Impark and its Business . . . and . . . diligently use his efforts and such time, skills, energy and attention as is reasonably necessary, required or advisable to satisfactorily provide the Services"; and

- "use his best efforts not to do anything to affect adversely the goodwill or reputation of Impark or its Business."

CA §§ 1.2, 1.3, ECF No. 80-4, at 120–21. Thus, the issue is whether MarcParc and Slavin materially breached these provisions of the APA and the CA and if so, whether their breach excused Impark's non-performance and imposed liability on MarcParc.

Impark argues that MarcParc and Slavin breached the warranties and representations in these contracts through undisclosed fraudulent conduct at 501 K Street beginning in 2011 and also through their failure to disclose, "[p]rior to the APA closing, . . . that four particular properties/contracts faced substantial risk of being canceled, in whole or in part, after the HoldBack Period expired," despite their awareness of plans for cancellation or redevelopment ("Cancelled and Redeveloped Properties"). Defs.' Opp'n & Mem. 9; *see also id.* at 24. One lot was, in part, "under contract for sale to the District of Columbia in 2014 for development of a soccer stadium" (plans that fell through and, in 2015, the District of Columbia condemned the property). *Id.* at 9 & n.11. Another property "was pursuing redevelopment plans as of August 2014." *Id.* at 9. And, "the management company of two other properties . . . likely was going to cancel its contracts for those properties after the APA closed" because "[t]he property manager was highly suspicious of many practices implemented by Slavin/MarcParc and she was looking for an opportunity to replace MarcParc, which she ultimately did shortly after the Holdback Period expired." *Id.* at 10. As for 501 K Street, it is undisputed that Slavin allowed an "entity known as Tag-B to valet park cars at the Lot [at 501 K Street] after hours" and did not inform 501 K Street's owners (Steuart Investment

Corporation and Boston Properties) about this income, which amounted to $1500–2000 per month, beginning in 2011 at the latest. Pls.' Mem. 18; Def.'s Opp'n & Mem. 5–6; Pls.' Reply & Opp'n 3; Slavin Dep. 106:19–107:14, ECF No. 89-25. 501 K Street's owners learned about the arrangement with Tag-B through a May 29, 2015 audit report, months after the APA's effective date of March 1, 2015, Slavin Dep. 106:19–107:14, 117:7–8; Pls.' Mem. 18; Def.'s Opp'n & Mem. 5–6, and eventually filed suit against MarcParc and Impark, Def.'s Opp'n & Mem. 8; Pls.' Reply & Opp'n 15.

Under D.C. law, which applies to the Purchase Agreement, to prevail on a claim for breach of contract, a party must "prov[e] the necessary elements of a breach of contract: '(1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by the breach.'" *Battles v. Washington Metro. Area Transit Auth.*, No. 16-CV-1655 (EGS), 2019 WL 1296944, at *3 (D.D.C. Mar. 21, 2019) (quoting *Mesumbe v. Howard Univ.*, 706 F. Supp. 2d 86, 94 (D.D.C. 2010)). Notably, the prior-material-breach doctrine provides that "a party may defend against a breach of contract claim on the ground that its performance was excused by the other party's prior breach of the contract." *Donald Marshall Berlin v. Bank of Am., N.A.*, 101 F. Supp. 3d 1, 15 (D.D.C. 2015) (quoting *United States v. Kellogg Brown & Root Servs., Inc.*, 856 F. Supp. 2d 176, 185 (D.D.C. 2012)). Indeed, "if a party to a contract fails to perform, the other party may not be required to perform," as "a party's failure to perform can mean that the other's party's performance 'did not come due.'" *Burks Companies, Inc. v. Howard Univ.*, No. CV 16-2312 (DLF), 2018 WL 4193640, at *3 (D.D.C. May 9, 2018) (quoting *Sununu v. Philippine Airlines, Inc.*, 638 F. Supp. 2d 35, 38, 40 (D.D.C. 2009)).

Not just any breach will do, however, and one party's nonperformance does not automatically excuse that of the other party. *See id.* ("the other party *may* not be required to perform" (emphasis added)).

> [A] party's performance need not be *perfect* in order to trigger the other party's obligations. Rather, "substantial performance," *i.e.*, performance without a material breach, is sufficient. *See id.* at 238–240; *3511 13th St. Tenants' Ass'n v. 3511 13th St., N.W. Residences, LLC*, 922 A.2d 439, 445 (D.C. 2007); *Landmark Health Sols., LLC v. Not For Profit Hosp. Corp.*, 950 F. Supp. 2d 130, 137–38 (D.D.C. 2013) ("[A] party is not automatically excused from the future performance of contract obligations every time the other party commits a breach. Rather, if the breach has not contributed materially to the contract being terminated, it does not excuse performance." (citations omitted) ); *see also Clayman*, 518 F.2d at 1034–35 ("[A party] may demand, in the way of the other's performance, substantial compliance with the terms of the contract. In most cases—perhaps all but a relatively few—a promisor's tender in good faith of a performance fully in compliance with the contract save for minor and unimportant deviations avoids a breach enabling the promisee to escape his obligations thereunder.") . . . . For a breach to be material, "it must 'go to the root' or 'essence' of the agreement between the parties," *Landmark Health Sols.*, 950 F. Supp. 2d at 137 (quoting 23 Williston on Contracts § 63:3), or "it must be so serious [as] to destroy the essential object of the agreement." *3511 13th St. Tenants' Ass'n*, 922 A.2d at 445 (D.C. 2007). That is, a material breach is "a failure to do something that is so fundamental to a contract, that not performing that obligation defeats the essential purpose of the contract, or makes it impossible for the other party to perform under the contract." *Landmark Health Sols.*, 950 F. Supp. 2d at 137 (citing *3511 13th St. Tenants' Ass'n*, 922 A.2d at 445).

*Id.* Notably, "whether a breach of contract is 'material' is an issue of fact, and such questions 'are the sort [courts] properly rely on juries to decide.'" *Malik Corp. v. Tenacity Grp., LLC*, 961 A.2d 1057, 1061 (D.C. 2008) (quoting *3511 13th St. Tenants v. 3511 13th St. N.W. Residences,* 922 A.2d 439, 445 (D.C. 2007)).

Maryland law, which applies to the Consulting Agreement, is similar, as "only a material breach [of contract] discharges the non-breaching party of its duty to perform." *Jay Dee/Mole Joint Venture v. Mayor & City Council of Baltimore*, 725 F. Supp. 2d 513, 526 (D. Md. 2010). And, material breach is defined the same under Maryland law as under D.C. law: "[a] breach is material

'if it affects the purpose of the contract in an important or vital way.'" *Id.* (quoting *Gresham v. Lumbermen's Mut. Cas. Co.,* 404 F.3d 253, 260 (4th Cir. 2005) (quoting *Sachs v. Regal Sav. Bank, FSB,* 705 A.2d 1, 4 (Md. Ct. Spec. App. 1999))). Additionally, when a party materially breaches a contract, it "is not entitled to recover damages for the other party's subsequent nonperformance . . . since the latter party's performance is excused." *Id.* at 528 (quoting 23 Williston on Contracts § 63:3 (4th ed.)). In *Jay Dee/Mole*, this Court observed that the Fourth Circuit has held that "plaintiff could not recover for defendant's contract termination, even though termination was pursued in a manner that violated the termination process prescribed by the contract, because plaintiff had previously materially breached and '[t]he fact of [a material] breach was all that the Maryland rule requires to bar [plaintiff] from recovering damages for breach of contract.'" *Id.* at 529 (quoting *Hubler Rentals, Inc. v. Roadway Express,* 637 F.2d 257, 260–61 (4th Cir. 1981)). Indeed, the Maryland Court of Special Appeals has noted that a plaintiff must prove its "own performance of all material contractual obligations" to recover for breach of contract. *Id.* (quoting *Collins/Snoops Assoc., Inc. v. CJF, LLC*, 988 A.2d 49, 57 (Md. Ct. Spec. App. 2010)).

Here, the alleged breaches concerned only five of fifty-three Parking Location Agreements (management contracts, leases and other agreements) that were a part of the assets that MarcParc sold to Impark in the APA. APA § 8.1(e)(i) & Sched. E, ECF No. 80-4, at 88–92. And, none of the agreements for those lots terminated prior to the expiration of the Holdback Period, which was intended to accommodate such terminations and allow the parties to adjust the purchase price accordingly. Additionally, with regard to the Cancelled and Redeveloped Properties, Plaintiffs offer evidence that they did not know about the redevelopment plans and that the undisclosed facts about condemnation were so widely known that it is not clear that they were under a duty to disclose. Pls.' Reply & Opp'n 10 (citing Gooch Dep. 45:11–17, ECF No. 89-18 (stating that he

did not remember discussing the condemnation with Slavin, but that the "threat of condemnation was shared with . . . [t]he world" because "[i]t was in the papers"). Further, as MarcParc contends, "[t]here is no representation or warranty from Plaintiffs that the property managers/landlords in question would not develop the land at issue, nor is there any representation or warranty regarding the duration of any management/lease agreements." *Id.* at 9.

But, if Plaintiffs had knowledge that the assets sold to Impark were likely to terminate, it certainly could be a misrepresentation for Plaintiffs to list those assets without disclosing their likely termination, as Impark was not purchasing them only for the Holdback Period. Moreover, Impark offers evidence to show that it was Slavin's fraudulent conduct in conjunction with managing 501 K Street that caused the lot's owners to terminate that contract, and that the 501 K Street contract was essential to the economic success of APA, from Impark's persesctive. Specifically, Impark attached evidence, which MarcParc did not dispute, that the May 29, 2015 audit of 501 K Street revealed that Slavin was generating income (for himself, but without paying 501 K Street its percentage) by allowing Tag-B to valet park cars at 501 K Street without informing the lot's owners, and the audit also described other "operational problems" at 501 K Street. Otteni Dep. 56:6–21, ECF No. 89-24; *see* Slavin Dep. 112:1–11. For example, "the lot has an early bird rate [$10] and an evening rate [$10]," and the rate was $15 "in the middle" of the day, but "the operator was left to his own devices as . . . there was no time clock to track when that switched over from 10 to $15 and from whom the operator received 10 or $15." Otteni Dep. 56:6–15. Additionally, "different pieces [of the tickets were] being used for incorrect reasons," which led the auditor to conclude that "those tickets were being what they called double run," that is, used for more than one person so that the operator could avoid reporting to the owner the revenue generated when the ticket was re-used. *Id.* at 56:13–21. Laura McNulty of Boston Properties told

Slavin it was "the worst audit she's ever seen." Slavin Dep. 110:1–2. Of the findings in the audit report, Peter Otteni, a senior vice president in the development department at Boston Properties, stated that "the most egregious one in [Boston Properties'] mind was Tag B." Otteni Dep. 13:12–15, 78:7–12.

After receiving the audit, Boston Properties informed Slavin at a meeting on June 17, 2015 that it "wanted him to terminate the agreement and to leave the [501 K Street] lot after some period of time where [the owner] w[a]s able to get another operator." Otteni Dep. 76:4–8; Slavin Dep. 114:20–21, 115:2–20 ("[At the June 17, 2015 meeting], they asked me to resign from the parking lot.").[5] Otteni stated that "[c]learly there was causation between the behavior [described in the audit] and the termination." Otteni Dep. 80:4–6. According to Otteni, "it was clear that [Boston Properties had] come to a point where termination [was] the only option . . . on the basis of these findings." *Id.* at 80:6–10.

Yet, the 501 K Street lease remained in effect at that time, and Impark did its best to resolve the issue with the 501 K Street owners. Pls.' Mem. 19; Def.'s Opp'n & Mem. 7–8. In MarcParc's view, Impark was successful in persuading 501 K Street to stay because the lease was not terminated in July 2015, Pls.' Mem. 19; in Impark's view, the meeting was anything but a success because 501 K Street declined to renew its lease when it ended in April 2016, Def.'s Opp'n & Mem. 7–8; *see* Otteni Dep. 129:10–21 (noting that Boston Properties provided Impark with formal notice that it "would not be renewing the lease when it expired on April 13, 2016"). And, as noted, 501 K Street's owners sued MarcParc and Impark. Def.'s Opp'n & Mem. 8; Pls.' Reply & Opp'n 15.

---

[5] At this point, the APA was signed and the Holdback Period had ended; it appears that Slavin was operating the lot on behalf of Impark pursuant to the Consulting Agreement.

Importantly, Impark had purchased MarcParc's assets "with the intent that [it] would be able to develop the Boston Property relationship . . . ." Johnson Dep. 280:15–19, ECF No. 89-28. Christopher Johnson, Impark's Rule 30(b)(6) corporate designee, stated that the company "certainly wanted to get involved with Boston Properties since they have so many locations in D.C., and [the 501 K Street lease] was an opportunity to develop something with them and hopefully create . . . more activity." Johnson Dep. 124:1–8. According to Johnson, the difficulties with the 501 K Street lease "really precluded [Impark] from any kind of relationship for some period of time until this is all said and done and is long past." *Id*. at 124:11–14.

There is further evidence in support of Impark's position that Slavin's fraud at 501 K Street hindered Impark's relationship with Boston Properties. Otteni explained that when Susan Cyran emailed Impark on Boston Properties' behalf following the notice of nonrenewal, stating that it hoped to "have the opportunity to partner again without the impediments that faced [the companies] at this project," she was

> referring to the MarcPark [sic] situation. She [was] referring to the fact that, but for the cloud of . . . everything that accompanied their assumption of the operations of this lot, they had done a really good job, and that she was sorry that [Boston Properties] couldn't have continued to work with them because of the circumstances.

Otteni Dep. 130:12–131:7, 131:10–16. Otteni stated that the lease was not renewed "specifically because of what Marc Slavin had done." *Id.* at 132:10–12.

There also is evidence in support of MarcParc's position, however. Indeed, Otteni also testified that Boston Properties continues to work with Impark, which "ha[s] been a long-time operator in San Francisco of a property" and although they did not win the bid on a local project, the "lack of success with that bid" was not due to Slavin's conduct at 501 K Street but rather "was on its own terms." Otteni Dep. 148:2–20. And, at least as of Otteni's January 23, 2017 deposition,

Boston Properties did not "have any policy . . . against awarding contracts to Impark." *Id.* at 148:21–149:1. Additionally, the non-renewal notice stated that Boston Properties "deeply appreciate[d] [Impark's] work and cooperation with [it] at the location and [it] hope[d] to find future opportunities to work with Impark." ECF No. 89-30. And, Impark concedes that "501 K Street later acknowledged that Impark had no knowledge of the wrongdoing being perpetrated against it." Def.'s Opp'n & Mem. 8 n.10. In light of these genuine disputes of material fact regarding Plaintiffs' alleged misrepresentations and the impact of Slavin's arrangement with Tag B at 501 K Street, I cannot conclude as a matter of law either that MarcParc's or Slavin's alleged fraudulent conduct or failure to disclose was a material breach that excused Impark's nonperformance under any of the contracts and made Plaintiffs liable to Impark, or that, regardless of these terminations and alleged fraud, Impark was obligated to pay amounts due under the contracts. *See Malik Corp.*, 961 A.2d at 1061; *Burks Cos.*, 2018 WL 4193640, at *3; *Jay Dee/Mole*, 725 F. Supp. 2d at 528–29. And, insofar as MarcParc argues that Impark's claims of damages from lost profits and loss of goodwill and reputational harm are too speculative, Pls.' Mem. 31–32, Impark has shown sufficient evidence of damages from the nonrenewal of the 501 K Street contract to survive MarcParc's summary judgment motion. *E.g.*, Otteni Dep. 76:4–8, 80:4–10, 132:10–12 (Slavin's conduct caused Boston Properties to want to terminate contract); Johnson Dep. 124:11–14 (testifying that Slavin's conduct "really precluded [Impark] from any kind of relationship [with Boston Properties] for some period of time until this is all said and done and is long past"); *id.* at 131:3–16 (observing that "when there's theft involved and deception and [Impark's] name is connected to that, by connected being MarcParc being purchased by us and our relationship with Mac, it's – you're going to have been damaged," and Impark "know[s] there's damage," even if "the quantification of future damage" is "all conjecture"). Further, MarcParc's

argument relying on contractual provisions to limit liability or the effects of MarcParc's alleged breaches as well as its waiver argument fail if MarcParc and/or Slavin breached first, because then Plaintiffs could no longer enforce the contracts. *See Donald Marshall Berlin*, 101 F. Supp. 3d at 15; *Jay Dee/Mole*, 725 F. Supp. 2d at 528–29. Therefore, other than the discrete issues discussed below, the parties' cross-motions are denied with regard to the parties' breach of contract claims.

### Damages for Cancellation of Contracts at 1627 I ("Eye") Street and the American College of Cardiology ("ACC")

The parties agree that the contracts for 1627 Eye Street and the ACC were cancelled before the end of the Holdback Period, and that the Arbitration Award "included 'credits' for those lost contracts to Impark." *See* Def.'s Opp'n & Mem. 33–34; Pls.' Mem. 5, 28. They also both note that I confirmed the Arbitration Award. Def.'s Opp'n & Mem. 33–34; Pls.' Mem. 5, 28. Believing that Impark now seeks damages for these cancelled contracts, MarcParc insists that awarding such damages to Impark would be to allow double recovery, which is impermissible under D.C. law. Pls.' Mem. 28. Impark maintains that it "is not seeking to obtain relief for those lost contracts in this litigation." Def.'s Opp'n & Mem. 34. Therefore, because Impark has made it clear that it "is not seeking damages for those contracts in this lawsuit," Def.'s Reply 2, MarcParc's request for relief as to them is denied as moot.

### Breach of the APA and TSA – Failure to Pay 501 K Street Litigation Expenses

Pursuant to the APA, MarcParc and Slavin

> jointly and severally agree[d] . . . to defend, indemnify and save [Impark] harmless from and against all Damages actually incurred by [Impark] in regard to any liability or obligation arising out of, resulting from or in connection with the ownership or use of the Assets or operation of the Business prior to the Closing Date [of the APA] and in connection with . . . (a) (i) any breach of the representations or warranties of [MarcParc] or Slavin set forth in Sections 8 or 34.1 of th[e] [APA] . . . or (b) any and all Excluded Liabilities.

APA § 19.1.   The APA further provided that Plaintiffs would "defend, indemnify and save

harmless [Impark] from and against all costs, expenses, losses, claims or liabilities, including

*reasonable* legal fees, suffered or incurred by [Impark] or any Persons arising out of such Excluded

Liabilities," that is, "any of the liabilities, debts or obligations of the Seller or the Business existing

or accruing at and as of the Closing Date, whether or not relating to the business, or otherwise

arising out of the ownership or use of the Assets or operation of the Business prior  to the Closing."

*Id.* § 4.1 (emphasis added).  Similarly, under the TSA, MarcParc Valet, Inc., and MarcParc, Inc.

(the "MarcParc Companies") and Impark each agreed to

> defend, indemnify and hold harmless (the "Indemnifying Party"), the other Party
> (the "Indemnified Party") from any and all losses, liabilities, damages, and
> expenses (including related costs and attorneys' fees) of every nature arising or
> resulting, directly or indirectly from or incident to any third party claim, demand or
> litigation actually or allegedly pertaining to: . . . (d) any gross negligence or willful
> misconduct of the Indemnifying Party (including, but not limited to, the
> Indemnifying Party's employees suppliers or contractors or their employees).

TSA § 7.1, ECF No. 80-4, at 161.

Impark claims that, after the 501 K Street owners filed suit against it and MarcParc,

Plaintiffs failed to defend and indemnify Impark.  Am. Countercl. ¶¶ 57, 62.  It seeks to recover

already-paid defense expenses of $71,554.64, a sum that includes attorneys' fees.  Def.'s Opp'n &

Mem. 35.  Impark argues that the Court should grant summary judgment on this counterclaim

because "Slavin/MarcParc do not contend the contractual provisions of the APA or TSA were not

satisfied such that there is no duty to cover Impark's defense costs in the 501 K Street Litigation,"

and "[i]t is undisputed that Slavin/MarcParc did not fulfill its defense obligations under the APA

or TSA with respect to the 501 K Street Litigation." Def.'s Opp'n & Mem. 35 & n.35.  According

to Impark, "[w]hen questioned why Slavin/MarcParc did [not] cover Impark's defense costs under

either contract, Slavin merely said it was because he thought Impark owed him more money than

the value of the 501 K Street Litigation." *Id.* at 35; *see also* Def.'s Reply 19. Indeed, Slavin testified as follows:

> Q. Now, you are obviously aware of a lawsuit in the District of Columbia against you and one of your companies, MarcParc, Inc., correct?
>
> A. Yes.
>
> Q. And that lawsuit is filed by 501 K Street Property Owner LLC?
>
> A. Correct.
>
> Q. And my client, Impark, is a defendant in that case as well, correct?
>
> A. Correct.
>
> Q. And you are aware that Impark has made a demand of you to defend it in that case, correct?
>
> A. Yes.
>
> Q. And you denied that defense, correct?
>
> A. I think we did, yes.
>
> Q. And that — Impark made that request to you pursuant to the asset purchase agreement, which has an indemnification provision?
>
> A. That's correct.
>
> Q. And, also, I believe the — one of the agreements — . . . the Transition Services Agreement — also has an indemnification provision. In fact, we went over it earlier today, correct?
>
> A. Correct.
>
> Q. And you declined to provide the defense to Impark in that case?
>
> A. Yes.
>
> Q. Why did you decline to provide the defense that Impark requested?
>
> A. Well, in speaking to my attorney, Steve Friedman, at the time —. . . I made the decision to —I thought it was in my best interest not to protect or defend Impark as a result of the amount of money that I believe is owed to me from the APA. And it pales in comparison to any indemnification issues or legal issues that are —result from the indemnification.
>
> Q. So other than the relative value of the case as you perceive it, or the relative value of the claims, I should say, as you perceive it, in your claim against Impark and what Impark is claiming to be in it for its defense costs and potential indemnification in the District of Columbia lawsuit, you think your claim far outweighs the value of my client's claim against you as it relates to this litigation — the District of Columbia litigation?

A. I guess that would be a fair summation of that, and the fact that I believe that they have not honored the APA, which led me to my decision on not indemnifying them.

Q. Do you have any basis for contending that the District of Columbia litigation is not subject to the indemnification provision in the APA or Transition Services Agreement?

A. I might have to refer to my attorneys for that, the answer to that question.

Q. As of — well, your understanding is as of this moment, do you have any factual basis to argue that it is not subject to that — those provisions?

A. No.

Slavin Dep. 356:1 – 359:3.

Plaintiffs do not argue that there has not been a breach of this provision. Rather, they contend that this counterclaim for $71,554.64 cannot be resolved on the current record because the Court must determine the reasonableness of the claimed attorneys' fees, and also because the bills Impark produced for attorneys' fees and client disbursements only total $40,998.61. Pls.' Reply & Opp'n 15 & n.10. In Reply, Impark notes

> Counsel for the parties conferred regarding Slavin's/MarcParc's contention about the amount of fees/costs reflected on the invoices Impark submitted (Ex. 81). Slavin's/MarcParc's argument was premised on the initial draft of the exhibit first produced, which was later supplemented with additional invoices in the final version sent to Slavin/MarcParc. Slavin/MarcParc now concur that Ex. 81 reflects $71,554.64 in fees/costs (the amount Impark claims).

Def.'s Reply 19 n.25. Plaintiffs have not challenged this point and thus have conceded that Plaintiffs have provided evidence of $71,554.64 in fees and costs. *See Clayton v. District of Columbia*, No. 11-1889 (RDM), 2019 WL 1284301, at *13 (D.D.C. Mar. 20, 2019); *Xenophon Strategies, Inc. v. Jernigan Copeland & Anderson, PLLC*, 264 F. Supp. 3d 61, 72 (D.D.C. 2017).

As for the reasonableness of the attorneys' fees, Impark asserts that Plaintiffs "waived their right to litigate the amount Impark recovers from the underlying litigation because they breached the duty to defend." Def.'s Reply 19. In support, Impark cites Wisconsin law, noting that "[i]t

appears that the District of Columbia has not addressed this specific issue." *Id.* at 19 n.24. The D.C. courts have held, however, the party seeking to recover attorneys' fees has the "burden of demonstrating the reasonableness of hours spent by submitting an invoice that is sufficiently detailed to permit the District court to make an independent determination whether or not the hours claimed are justified," observing that "[g]enerally, a 'reasonable attorneys' fee is based on the reasonable number of hours expended multiplied by a reasonable hourly rate." *Hawkins v. Potomac Lighthouse Pub. Charter Sch.*, No. 12-0264 GK/DAR, 2014 WL 185948, at *4 (D.D.C. Jan. 17, 2014) (quoting *Gray v. Dist. of Columbia,* 779 F. Supp. 2d 68, 71 (D.D.C. 2011)). Certainly, if a contract stipulates to an amount of attorneys' fees, the "contractual provision creates a rebuttable presumption that the stipulated amount is reasonable." *F.D.IC. v. Bender*, 127 F.3d 58, 65 (D.C. Cir. 1997), *superseded on other grounds as stated in Winston & Strawn, LLP v. McLean*, 843 F.3d 503 (D.C. Cir. 2016).

But here, the TSA provides for "attorneys' fees" and the APA provides for "reasonable legal fees"; neither provides a stipulated amount. *See* APA § 4.1; TSA § 7.1. Thus, while no genuine dispute exists as to Plaintiffs' liability for attorneys' fees under the APA and the MarcParc Companies' liability for attorneys' fees under the TSA,[6] in the absence of D.C. caselaw holding that a party can waive a reasonableness determination, the amount of damages is not a matter to be decided on summary judgment when reasonableness is disputed. *See Hawkins*, 2014 WL 185948, at *4. Consequently, Impark's motion is granted as to liability but denied as to damages with regard to its APA counterclaim in Count I against Plaintiffs for costs and fees from the 501 K Street Litigation and its TSA counterclaim in Count II against the MarcParc Companies for the same.

---

[6] Whether the Court can impose liability on Slavin under the TSA is discussed below.

**Miscellaneous Expenses that Impark Incurred**

As part of its Count I for breach of the APA, Impark seeks to recover "numerous pre-closing liabilities" totaling $303,289, which it paid, even though APA § 4.1 provided that MarcParc would remain liable for all such liabilities. Def.'s Opp'n & Mem. 36; *see* Am. Countercl. ¶ 56. Impark also seeks to recover "$35,708 in post-closing expenses" that, according to Impark, "does not appear to be in dispute." Def.'s Opp'n & Mem. 38 n.37.

Plaintiffs do not address the post-closing expenses. As for the pre-closing expenses, they argue that Impark made these payments voluntarily, without "inform[ing] Plaintiffs/Counter-Defendants or request[ing] their consent/agreement to proceed with the same." Pls.' Mem. 14. In their view, Impark's payments "constitute[] a failure to mitigate" or a waiver of any recovery of the amounts paid as damages. *Id.* at 35.

Impark insists that "the plain and unambiguous language of the indemnity provision in the APA suggests that payments of pre-closing liabilities may in fact be made by Impark, but Slavin/MarcParc would remain liable for such sums." *Id.* (citing Pls.' Mem. 35; APA §§ 4.1, 19.1). Alternatively, Impark contends that it had to pay amounts due to parties who were MarcParc's vendors and customers and became Impark's vendors and customers, "to avoid alienating Impark's new business partners and avoid litigation with them." Def.'s Opp'n & Mem. 37. Acknowledging that MarcParc contests both liability and damages for these claims in its Reply & Opposition, Impark asserts that, if the Court enters judgment in its favor as to liability, then "according to Slavin's/MarcParc's damages expert, there is no dispute as to $178,789 out of the $303,289," and the full extent of damages could be determined at trial. Def.'s Reply 20 & n.26.

The plain language of the APA required MarcParc to indemnify Impark for "any liability or obligation arising out of, resulting from or in connection with the ownership or use of the Assets

or operation of the Business prior to the Closing Date." APA § 19.1. The APA did not state that Impark, as the new owner, had to consult with MarcParc before paying debts encumbering the business it acquired from MarcParc; it simply provided that MarcParc would reimburse it for such payments. *See id.* I agree with Impark that there is no genuine dispute that MarcParc breached its contractual duty to reimburse Impark for liabilities and obligations that Impark paid, which MarcParc incurred, but failed to pay, related to its pre-closing business operations. The contractual language accounted for the circumstances in which MarcParc incurred an expense but failed to pay it before Impark took over its business; Impark could not be expected to sit idly by with unpaid bills owed to its new business associates, and run the risk of alienating those whose services were essential to the success of Impark's business. Accordingly, summary judgment is granted in Impark's favor as to liability for pre-closing liabilities. *See Battles v. Washington Metro. Area Transit Auth.*, No. 16-CV-1655 (EGS), 2019 WL 1296944, at *3 (D.D.C. Mar. 21, 2019); *Mesumbe v. Howard Univ.*, 706 F. Supp. 2d 86, 94 (D.D.C. 2010). And, given that MarcParc does not contest the post-closing expenses, summary judgment is granted in Impark's favor as to liability for post-closing expenses as well.

As for the amount of damages from these liabilities, Christopher Foote, CPA, testified in a deposition as an expert for MarcParc. Foote Dep. 7:20 – 8:3, ECF No. 89-91. He stated that the $303,000 total for pre-closing liabilities was overstated by approximately $124,500, resulting in an undisputed amount of "approximately" $178,500. *Id.* at 144:21 – 145:14. And, Impark contends that "[t]he fact and amount" of "[o]ne of the unfunded pre-closing liabilities that was calculated 'separately' from the others," one which "concerned the Hanover insurance premium," was for $19,534 and was "not in dispute." Def.'s Opp'n & Mem. 38 n.37. Indeed, Grieve testified that Impark paid a "Hanover amount" of $19,609 (not $19,534, as Impark asserts), which was part

of the $303,000 Impark claims. Grieve Dep. 151:21–153:12, ECF No. 89-6. This evidence establishes that MarcParc is liable to Impark for about $178,500; because these numbers are approximates, the precise amount of damages for pre-closing liabilities will need to be determined at trial. As for post-closing expenses, Impark notes that Grieve testified that the amount of post-closing expenses was $35,708, Grieve Dep. 169:3–14; MarcParc has not identified any evidence to the contrary. Therefore, it is undisputed that MarcParc is liable to Impark for $35,708 in post-closing expenses.

### Payroll Costs

In the APA, MarcParc represented and warranted that:

Since the date of the most recent balance sheets contained in the Financial Statements, there has not been: . . . (iii) any material increase in the compensation or to become payable by [MarcParc] to any of its officers, employees or agents or any bonus, payment or arrangement made to or with any of them, except increases agreed to in writing by [Impark].

APA § 8.1(h)(iii). Impark contends that, in breach of this warranty, "in or about February or March 2015, shortly before the APA closed, . . . Slavin gave substantial pay raises to eleven MarcParc employees" and implemented the raises "after MarcParc's last disclosure of its payroll was made to Impark," but did not disclose the pay raises to Impark. Def.'s Opp'n & Mem. 38, 39. It offers evidence in support of these facts. *See* Arjantseva Dep. 209:17-212:9 (recalling that she sent pay schedules to Impark at the end of 2014 and then she received a raise from MarcParc in February 2015 that was not reflected in her pay until late February or early March 2015 and not reported to Impark, which "didn't ask for it"); Slavin Dep. 56:17–20, 57:9–12, 58:1–11 (stating that MarcParc provided pay raises to some of its employees in early 2015, prior to the APA closing, and that he did not know if Impark was informed or if MarcParc was "obligated to do that"). According to Impark, "these pay raises substantially diminished Impark's financial analysis of the transaction."

Def.'s Opp'n & Mem. 38–39.  It offers evidence that "Impark, effectively, paid five and a half times 50-something thousand dollars a year too much for the business, because now income was going to be lower and Impark wasn't given the opportunity to say yes or no." Copping Dep. 140:4–8, ECF No. 8-77.  As for the damages that the alleged breach caused, Impark insists that it "is undisputed [that] Impark's added cost for one year is $57,962."  Def.'s Opp'n & Mem. 39.

MarcParc disputes whether the failure to disclose was a breach and whether Impark suffered damages.  In MarcParc's view, the pay raises were part of the ordinary course of business, such that there was no duty to disclose.  *See* Pls.' Mem. 13.  But, the APA affirmatively obligated MarcParc to disclose "material increases in the compensation," without carving out an exception for raises in the ordinary course of business.  *See* APA § 8.1(h)(iii).  Whether these raises were material, such that the failure to disclose the raises was a breach, cannot be determined on the record before me.  Therefore, I cannot decide as a matter of law whether MarcParc breached this contractual duty.  *See Battles v. Washington Metro. Area Transit Auth.*, No. 16-CV-1655 (EGS), 2019 WL 1296944, at *3 (D.D.C. Mar. 21, 2019); *Mesumbe v. Howard Univ.*, 706 F. Supp. 2d 86, 94 (D.D.C. 2010)).

MarcParc also argues that, even if the failure to disclose the raises were a breach, Impark cannot prove damages because "it was under no obligation, contractual or otherwise, to pay former MarcParc employees the same salary as their final salary at MarcParc."  Pls.' Reply & Opp'n 14; Pls.' Mem. 33–34.  Impark counters that it "would not have asked for a representation and warranty (on which it expressly relied) regarding payroll costs if there was no intent to continue paying employees at their existing rates of pay." Def.'s Reply 18.  In Impark's view, MarcParc's "position disregards the realities of the transaction and running a business," because "it would be impractical to reduce employee compensation while trying to transition MarcParc to Impark, as employee

defections likely would occur." *Id.* at 18–19.  Impark also argues that it incurred actual damages

because, due to the arrangement under the TSA, it initially unknowingly paid the higher salaries.

*Id.*  Indeed, the undisputed evidence is that "[t]he employees of MarcParc, even though technically

hired by Impark at closing or thereabouts, did not actually move on to Impark payroll for several

months, which was part of the transition services, so the actual knowledge by Impark that people

were being paid an amount different than what Impark had looked at during due diligence was not

known until sometime after closing," that is "at least weeks or months after the closing."  Copping

Dep. 138:10–17, 139:14–16, ECF No. 89-77.

I agree with Impark.  If Impark can prove that MarcParc committed a material breach of

its duty under the APA by failing to disclose the raises, then it also can show damages, based on

either the salaries it actually paid at a higher than expected rate before it learned of the raises, or

based on the fact that, while it was not contractually obligated to honor the employees' existing

salaries, it would be unrealistic to expect a new business owner to begin its relationship with its

new employees by reducing some of their salaries.  Therefore, both parties' summary judgment

motion are denied as to MarcParc's liability under Count I of the Amended Counterclaim for

damages caused by failure to disclose payroll increases.

### Tortious Interference with Contractual Relations or Prospective Economic Advantage (Am. Countercl. Count V)

Impark claims that Plaintiffs tortiously interfered with Impark's business relationship with

the 501 K owners, causing them to terminate or not renew the 501 K Street lease and causing

Impark to lose existing or potential contracts at other properties that 501 K Street's owners owned.

MarcParc and the 501 K Street owners first signed the 501 K Street lease in March 1996, and they

renewed it twelve times, such that another renewal was expected.  501 K St. Lease, ECF No. 80-

8, at 3; Twelfth Am. to 501 K St. Lease, ECF No. 80-39; Otteni Dep. 188:1–9 ("[T]here were 12

extensions of this lease over the years, I see no reason why Impark wouldn't have been retained on the lot but for this occurrence and the findings of the audit.").

MarcParc argues that Impark's tortious interference counterclaim "fails as a matter of law" because "the alleged duty under Count V is the same as Impark's Breach of Contract claim," and "'a breach of contract may only give rise to a tort claim where there is an independent basis for the duty allegedly breached'." Pls.' Reply & Opp'n 12 (quoting *KBI Transp. Servs. V. Med. Transp. Mgmt., Inc.*, 679 F. Supp. 2d 104, 108-09 (D.D.C. 2010)).[7] Impark does not address this argument in its Reply, and "when a [party] files an opposition to a dispositive motion and only addresses certain arguments raised by the [moving party], a court may treat those arguments that the plaintiff failed to address as conceded." *Clayton v. District of Columbia*, No. 11-1889 (RDM), 2019 WL 1284301, at *13 (D.D.C. Mar. 20, 2019) (quoting *Xenophon Strategies, Inc. v. Jernigan Copeland & Anderson, PLLC*, 264 F. Supp. 3d 61, 72 (D.D.C. 2017)). And, it is true that Impark must show "a duty independent of that arising out of the contract itself," as "the injury to the plaintiff must be an independent injury over and above the mere disappointment of plaintiff's hope to receive his contracted-for benefit." *William Loveland Coll. v. Distance Educ. Accreditation Comm'n*, 347 F. Supp. 3d 1, 21 (D.D.C. 2018) (quoting *Choharis v. State Farm Fire & Cas. Co.*, 961 A.2d 1080, 1089 (D.C. 2008)). But, Impark arguably has done so: Impark's contractual expectation was that it would have a lease for 501 K Street that would, at least, run its course. The injury Impark alleges is that, after the lease ran its course, Impark suffered damages because the lease was not renewed.

Nonetheless, MarcParc also argues that, to prevail, Impark would have to "prove, among other elements, Slavin's 'intentional procurement of the contract's breach,'" which MarcParc

---

[7] Both parties apply D.C. law. Pls.' Reply & Opp'n 12; Def.'s Reply 16.

insists Impark cannot do because (1) the contract was not breached, it simply was not renewed, and (2) Impark has not shown any intent on Slavin's part to cause a breach. *Id.* at 12–13 (quoting *Murray v. Wells Fargo Home Mortg.*, 953 A.2d 308, 325 (D.C. 2008)). Impark counters that MarcParc's fraudulent conduct shows an intent to breach the contract, as "fraud is exactly the type of misconduct that gives rise to a tortious interference claim." Def.'s Reply 16–17.

> "In the District of Columbia, a tortious interference with contract claim has four required elements: '(1) the existence of a contract; (2) knowledge of the contract; (3) intentional procurement of a breach of the contract; and (4) damages resulting from the breach.' " *Teltschik v. Williams & Jensen, PLLC*, 683 F.Supp.2d 33, 56 (D.D.C. 2010) (citation omitted), *aff'd*, 748 F.3d 1285 (D.C. Cir. 2014). "A tortious interference with prospective economic advantage claim has identical elements, except that the plaintiff must demonstrate the existence, knowledge, and intentional procurement of a breach of a prospective advantageous business transaction instead of meeting those elements as to a contract." *Id.* (citing *Casco Marina Dev., LLC v. District of Columbia Redevelopment Land Agency*, 834 A.2d 77, 84 (D.C. 2003)).

*Klayman v. Judicial Watch, Inc.*, 267 F. Supp. 3d 81, 86 (D.D.C. 2017). Impark cannot prevail on a counterclaim for tortious interference with *contractual* relations because 501 K Street's owners did not terminate the existing contract with 501 K Street; rather, they decided not to renew it. *See id.*

As for tortious interference with *prospective economic advantage*, what is required is proof of intent to cause a breach, not simply an intentional act leading to breach. *Banneker Ventures, LLC v. Graham*, 225 F. Supp. 3d 1, 14 (D.D.C. 2016) (observing, with regard to tortious interference with contact, that "[a] plaintiff cannot establish liability without a strong showing of intent to disrupt ongoing business relationships" (citing *Genetic Sys. Corp. v. Abbott Labs.*, 691 F. Supp. 407, 423 (D.D.C. 1988)). Here, Plaintiffs' alleged fraud may have been intentional, but there is no evidence that Plaintiffs intended to cause a "breach of a prospective advantageous business transaction" that Impark might have had with the 501 K Street owners. *See Klayman*, 267 F. Supp. 3d at 86; *Banneker*, 225 F. Supp. 3d at 14. Even in the light most favorable to Impark,

the undisputed facts fail to prove that Slavin intended for the 501 K Street owners to find out about the Tag-B arrangement; the more reasonable inference is that Slavin intended for the contract between the 501 K owners and Impark to continue and to be renewed so that he could continue to assist in the management of the lot pursuant to the CA, surreptitiously lining his pockets in the process by allowing the Tag-B valet operation to continue. Therefore, Impark cannot prevail on a counterclaim for breach of prospective economic advantage. *Klayman*, 267 F. Supp. 3d at 86; *Banneker*, 225 F. Supp. 3d at 14. MarcParc's summary judgment motion is granted as to Impark's tortious interference claim, and Impark's is denied.

### Joint and Several Liability

Impark insists that Slavin should be held jointly and severally liable for any misconduct for which the Court only finds the MarcParc Companies liable. Def.'s Opp'n & Mem. 39–40. Plaintiffs counter that Impark failed to plead a counterclaim for piercing the corporate veil. Pls.' Reply & Opp'n 15. But "[t]he doctrine of veil piercing is not a cause of action in and of itself. Rather, it is a means of imposing liability on an underlying cause of action." *Boland v. Ace Masonry, Inc.*, No. 12-1375 (TSC-AK), 2016 WL 9825778, at *11 (D.D.C. July 14, 2016), *report and recommendation adopted*, No. 12CV1375TSCAK, 2017 WL 4712078 (D.D.C. May 23, 2017); *see also TAC-Critical Systems, Inc. v. Integrated Facility Systems*, 808 F. Supp. 2d 60, 66 (D.D.C. 2011) (noting that "assertions concerning veil-piercing merely comprise a legal theory by which [a party] hopes to extend liability—on its underlying breach-of-contract claim—beyond [a company] as a corporate entity to [a person] as an individual"). Alternatively, Plaintiffs argue that piercing the corporate veil is "an extraordinary measure" and "as Impark acknowledges, one of the prerequisites to piercing the corporate veil is that the 'corporate form' be used to perpetuate

fraudulent or unlawful conduct." Pls.' Reply & Opp'n 15, 16 (citing Defs.' Opp'n & Mem. 33–34).

It is true that "[a] party may 'pierce the corporate veil upon proof that there is (1) unity of ownership and interest, and (2) use of the corporate form to perpetrate fraud or wrong,'" but a party also may do so if there are "considerations of justice and equity [other than use of the corporate form] to justify it." *Bazarian Int'l Fin. Assocs., LLC v. Desarrollos Hotelco, C.A.*, 342 F. Supp. 3d 1, 12 (D.D.C. 2018) (quoting *Estate of Raleigh Mitchell*, 947 A.2d 464, 470 (D.C. 2008)).

> There is neither a "precise formula by which to predict when courts will pierce the corporate veil since each case is sui generis," nor "a uniform standard to determine whether the evidence has sufficiently demonstrated unity of interest and ownership." "[T]he factor which predominates will vary in each case, ... influenced by considerations of who should bear the risk of loss and what degree of legitimacy exists for those claiming the limited liability protection of a corporation."

*Id.* (quoting *Vuitch v. Furr*, 482 A.2d 811, 816 (D.C. 1984)).

In support of piercing the corporate veil, Impark asserts that "the representations and warranties in the APA were made jointly and severally by both Slavin and MarcParc" and "Slavin was the individual who committed the fraud in this case through his acts and omissions." Def.'s Opp'n & Mem. 39. Impark states that "Slavin is the sole owner of both MarcParc, Inc. and MarcParc Valet." *Id.* at 40. While the Court may be able to conclude on the undisputed evidence that there is a unity of interest and ownership, I cannot determine as a matter of law whether "considerations of justice and equity" justify its application. *See id.* Therefore, Impark's motion for summary judgment on this ground is denied. Resolution of this issue must await trial.

## Conclusion

In sum, the parties' cross-motions for partial summary judgment are denied, except that

1. MarcParc's motion is granted on Impark's counterclaim for tortious interference (Count V);

2. Summary judgment is entered in MarcParc's favor on Count V of the Amended Counterclaim;

3. MarcParc's motion is granted regarding any counterclaim Impark sought to bring, in its substantive briefing, for breach of the duty of good faith and fair dealing;

4. Insofar as Impark claims breach of the duty of good faith and fair dealing, its claim IS DISMISSED;

5. Impark's motion is granted, and summary judgment is entered in its favor, as to liability only, on

   a. its APA counterclaim in Count I against Plaintiffs for costs and fees from the 501 K Street Litigation;

   b. its TSA counterclaim in Count II against the MarcParc Companies for costs and fees from the 501 K Street Litigation; and

   c. its claim in Count I of the Amended Counterclaim for pre- and post-closing liabilities.

A separate order will issue. A conference call will be scheduled to set in a trial.


Date: <u>March 27, 2019</u>                          <u>    /S/                    </u>
                                                       Paul W. Grimm
                                                       United States District Judge

lyb